**Salvatore GIGLIO and Carmela Giglio, Plaintiffs-Appellants,**

v.

**FARRELL LINES INCORPORATED, Defendant-Appellee, and Third-Party Plaintiff,**

v.

**UNIVERSAL MARITIME SERVICE CORP., Third-Party Defendant.**

No. 924, Docket 79–7078.

United States Court of Appeals, Second Circuit.

Argued June 4, 1979.

Decided Jan. 4, 1980.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiffs-appellants.

Peter A. Junge, New York City (Lilly, Sullivan & Purcell, P. C., New York City, of counsel), for defendant-appellee, and third-party plaintiff.

Before OAKES and MESKILL, Circuit Judges, and SIFTON, District Judge.*

MESKILL, Circuit Judge:

Salvatore Giglio and his wife Carmela appeal from a judgment entered in the

---

* Honorable Charles P. Sifton, United States District Judge for the Eastern District of New York, sitting by designation.

United States District Court for the Southern District of New York after a three-day bench trial before Morris E. Lasker, *Judge*, dismissing their complaint in an action brought under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.* We affirm.

## BACKGROUND

Salvatore Giglio ("appellant"), a longshoreman employed by Universal Maritime Service Corporation ("stevedore"), was injured on May 30, 1974 while unloading cargo from the AFRICAN NEPTUNE, a ship owned and operated by appellee Farrell Lines Incorporated. At the time of the accident, appellant's gang was unloading steel drums, containing sheep pelts packed in brine, from a locker located on the main deck of the ship. A few men were working inside the locker and three or four men, including Giglio, were working in the area just outside the doorway to the locker. The unloading was accomplished in the following manner. The drums, each weighing several hundred pounds, were rolled one at a time over the raised lip of the locker doorway onto a wooden pallet positioned on the deck. When anywhere from three to six drums had been placed on a given pallet—the number of drums on each pallet depending on the number of drums designated for a particular consignee—the longshoremen on the deck attached a bridle to the pallet and the pallet was then lifted from the deck by the ship's winch.

Judge Lasker found that after the gang had been at work on this particular locker for about an hour, Giglio, as he reached for a bridle, slipped on the deck, lost his balance, and fell backwards onto the ship's spreader.[1] In the district court Giglio claimed that two factors precipitated his fall and that both were attributable to the negligence of the ship. First, he argued, the proximity of the spreader to the locker rendered the available work space cramped.

Second, he argued, the condition of the deck rendered the work area slippery. Each factor, according to Giglio, contributed to the unreasonably unsafe condition which led to his fall.

It was undisputed that the work area outside the locker was quite small. On one side of the doorway to the locker stood the spreader. On the other side of the doorway there was a hatch coaming. The deck area between the spreader and the coaming was little more than six feet wide. Because the rectangular wooden pallets, which measured four feet by six feet, were placed on the deck so that one of the six foot sides faced the locker opening, the longshoremen responsible for attaching the bridles to the pallets had very little room in which to maneuver.

As to the condition of the deck, the district court found that the area of the deck on which the accident occurred was indeed covered with a slippery coating—consisting of graphite and brine. Just prior to unloading the locker containing the drums of sheep pelts, Giglio and the other members of his gang had been discharging bags of graphite from another locker also located on the main deck. Appellant's witnesses testified, and Judge Lasker found, that a small amount of graphite powder had escaped from the bags and had been scattered over the deck. Judge Lasker also found that, subsequently, as the sheep pelts were unloaded, "either because of leaks from the drums or because of a possible distillation of some kind upon the drums, there was liquid shed from, or exuded from, or actually coming out of the drums in such an amount as when combined with the graphite, to render the area slippery." He further found "that Mr. Giglio, insofar as human beings can d[i]vine these things, would probably not have slipped if that material had not been there."

However, Judge Lasker found no negligence on the part of the ship in regard to either the size of the work area or the

---

**1.** A spreader is a large piece of equipment used to load or unload containerized cargo. The 40-foot spreader onto which Giglio fell belonged to the ship. It was not in use at the time of the accident.

condition of the deck. As to the former, Judge Lasker found that it would have been possible for the men to work safely in the space available if the deck had not become slippery. He found, in the alternative, that had the work area not been sufficiently large to permit the longshoremen to work safely, it would have been the responsibility of the stevedore to obtain permission from the ship to move the spreader to another location.

The court determined that the ship had also "met its responsibilities" in regard to "the slipperiness of the deck." In Judge Lasker's view, the ship "had every right to believe that [the longshoremen] were capable of curing the situation and that they would cure the situation." Concluding that appellant had "failed to establish the negligence of the ship," Judge Lasker ordered that judgment be entered dismissing the complaint.[2]

## DISCUSSION

On appeal, Giglio makes a broadbased attack on both the findings of fact and the conclusions of law of the district court. The most serious charge leveled against the decision below is that the district court applied an erroneous view of the law governing a ship's liability for damages flowing from injuries suffered by a longshoreman engaged in loading or unloading its cargo. Appellant contends that the district judge was misled by the confused state of the law in this Circuit. In my view, however, the appropriate legal standard to be applied in this particular case is easily perceived, and when the facts found below are judged according to that standard, it is clear that we must affirm the dismissal of appellant's complaint.

The 1972 amendments to the LHWCA effected a major change in the legal and economic relationships among injured longshoremen, their stevedores, and the vessels on which they work. The state of the law prior to the 1972 amendments and the concerns that prompted Congress to redefine the rights and obligations of these parties have been fully described and analyzed by this Court on a number of occasions.[3] Little can be added to what has been written. For the purposes of this case it is sufficient merely to reiterate that the 1972 revisions were intended "to make the vessel liable for its own negligence, relieving it of liability only for the negligence of those engaged in providing stevedoring services." *Napoli v. Hellenic Lines*, 536 F.2d 505, 507 (2d Cir. 1976). In abolishing the doctrine of unseaworthiness under the LHWCA, Congress made clear its intent that the courts discard such concepts as no-fault liability and the non-delegable duty to provide a safe workplace and substitute traditional, land-based principles of negligence. *Cf. Zielinski v. Companhia De Navegacao Maritime, etc.*, 460 F.Supp. 1179, 1182 (S.D.N.Y.1978) ("The shipowner is not an insurer of safety; his duty is to provide the longshoreman with a reasonably safe place to work . . . not an accident-free ship," *citing Napoli, supra*.) However, refinement of the precise duty of care owed by a vessel to the longshoremen handling its cargo has been left largely to the courts. *Napoli, supra*, 536 F.2d at 507.

In the leading case of *Napoli v. Hellenic Lines, supra*, this Court held that the imposition on vessels of the standard of care

**2.** Giglio sought to recover for the physical injuries he sustained in the fall, but because the trial was bifurcated as to liability and damages, the extent of his injuries is not reflected in the record before us. Because Carmela Giglio's claim for loss of consortium was grounded on the same allegations of negligence as was her husband's claim, Judge Lasker's determination that the Giglios had failed to establish the negligence of the ship necessitated the dismissal of the complaint as to each of the plaintiffs. As a result of the dismissal of the Giglios' action, the third party complaint of Farrell Lines, which

had sued the stevedore for indemnity, was also dismissed. The merits of the third party action are not at issue on this appeal.

**3.** *See, e. g., Landon v. Lief Hoegh and Co.*, 521 F.2d 756 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); *Napoli v. Hellenic Lines*, 536 F.2d 505 (2d Cir. 1976); *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d 837 (2d Cir. 1977); *Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2d Cir. 1979).

embodied in § 343A of the Restatement of Torts 2d would be consistent with the purposes of the amended LHWCA. This section provides in part:

A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

This standard, which has been consistently adhered to by this Court,[4] was explicitly applied by Judge Lasker to the evidence presented at trial.

I cannot characterize as erroneous Judge Lasker's determination that in this case the ship met the *Napoli* standard of due care. Regarding the size of the work area, it is conceded that the location of the ship's spreader gave the men stationed outside the locker very little working room. However, it was undisputed that the day before the accident Giglio's own gang had attached the spreader to the particular frame on which it stood at the time of the accident. Furthermore, the evidence indicated that there were several other areas on the ship suitable for storage of the spreader and that the move to another location could have been accomplished by a couple of men within seven to ten minutes. According to the testimony of various witnesses, the longshoremen could have moved the spreader in order to give themselves more room; one longshoreman even testified that the stevedore's hatch boss had ordered the gang to do so in the past.

The only evidence introduced that would tend to support the inference that the ship bore any responsibility for the placement of the spreader—testimony by one of appel-

lant's witnesses that permission to move the spreader had been sought from and denied by a member of the ship's crew—was apparently either not credited by the district court or not found to be persuasive. In any case, the district court found that the limited size of the work area, by itself, presented no hazard to the longshoremen. Appellant simply failed to carry his burden of demonstrating, as required for the imposition of liability under *Napoli*, that the ship should reasonably have anticipated that the longshoremen would not be able to avoid whatever danger was presented by the proximity of the spreader to their work area.

Nor do I view as erroneous Judge Lasker's determination that the ship met its responsibilities in regard to the condition of the deck. Judge Lasker found that as the drums of sheep pelts were unloaded the work area became slippery. Unfortunately, it is not clear from Judge Lasker's statement of his findings whether he believed that the ship had notice of the wet condition of the deck, although I think such a finding is implicit in his remarks.[5] For purposes of review, I have resolved this ambiguity in appellant's favor, and have proceeded on the assumption that the ship had notice of the presence of liquid on the deck. However, while in some circumstances notice of a dangerous condition arising during the loading or unloading process may be a precondition of liability, *Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861, 862 (2d Cir. 1977); *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d 837 (2d Cir. 1977), liability does not spring from notice alone. The *sine qua non* of a ship's liability for an obviously dangerous condition arising during the process of loading or unloading is reasonable anticipation

---

**4.** Although the ship in *Napoli, supra,* was acting as its own stevedore, the standard of care articulated in that case has subsequently been applied in those cases involving independent stevedores. *See Lubrano v. Royal Netherlands Steamship Company*, 572 F.2d 364, 366 n.3 (2d Cir. 1978). *See also Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 323 (2d Cir. 1978); *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2d Cir.), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

**5.** The sparseness of Judge Lasker's statement of his findings and conclusions, delivered orally at the end of trial, has rendered the review process more difficult than it might otherwise have been. Nevertheless, in my view a remand would serve no useful purpose, because even when all the ambiguities are resolved in appellant's favor, it is clear that Judge Lasker's dismissal of the complaint was proper.

that the longshoremen will not be able to avoid it. *Napoli, supra,* 536 F.2d at 509. *See also Hickman v. Jugoslavenska Linijska, etc.,* 570 F.2d 449 (2d Cir. 1978).

Again, the evidence amply supports Judge Lasker's determination. Despite his conclusory allegations, Giglio offered no evidence—such as industry custom, past dealings, or an implicit or explicit agreement between the parties—that would support the inference that the ship's failure to act was unreasonable under the circumstances. *Compare Espinoza v. United States Lines, Inc.,* 444 F.Supp. 405, 407 (S.D.N.Y.), *aff'd,* 586 F.2d 832 (2d Cir. 1978) (expert testimony offered to establish whether inspection of containers by ship was customary). On the day of the accident, when Giglio's gang proceeded from the graphite locker to the sheep pelt locker they were accompanied by a member of the ship's crew who was responsible for opening the locker door. As soon as the door was opened it was discovered that the steel drums inside were standing in several inches of strong-smelling liquid—presumably brine that had leaked out during the voyage. Undisputed testimony established that the longshoremen requested buckets and shovels, which were promptly provided by the crew, and proceeded to bail out the locker before attempting to unload the drums. Significantly, there was no evidence that the ship's crew reprimanded the longshoremen for requesting these materials or for delaying the unloading while performing this clean-up job. There was uncontradicted evidence that the ship had about twenty bags of sawdust available on board the day of the accident, and there was no evidence that the ship's crew refused a request for sawdust or any other additional materials. Furthermore, there was no evidence that leaky or wet barrels constituted an unusual type of cargo. *Cf. Anderson v. Iceland Steamship Co.,* 585 F.2d 1142, 1151 (1st Cir. 1978) ("The stevedore is hired for its expertise in handling cargo, including cargo which arrives from its jour-

ney in less than optimal condition.") (footnote omitted).

Although the gang was working on the deck rather than down in the hold, *cf. Munoz v. Flota Merchante Grancolombiana, S. A., supra,* the evidence fully supports the inference that the unloading operation being carried out in the small, six foot wide area immediately adjacent to the locker was within the sole control of the stevedore. *See Cox v. Flota Mercante Grancolombiana, S. A.,* 577 F.2d 798, 802 (2d Cir.), *cert. denied,* 439 U.S. 881, 99 S.Ct. 222, 58 L.Ed.2d 195 (1978). Appellant's hatch boss testified that the men knew their work, that they took orders only from him and not from the crew, and that it was part of his job to see that the deck was clean. The stevedore's sole control over the unloading process was further evidenced by the fact that the longshoremen had placed a large piece of plywood on the deck area right outside the locker doorway so that the steel drums would not slide on the steel deck as they were rolled over the lip of the locker. Also indicative was the fact that it was the longshoremen who determined that it was preferable to place the pallets with a six foot side, rather than a four foot side, facing the locker—despite the fact that this choice cut down sharply on the space in which Giglio could work. There was no evidence indicating that the ship was involved in such decisions in any manner whatsoever.

In the face of such evidence I cannot conclude that the district judge erred in determining that the ship should not have reasonably anticipated that the longshoremen—who had requested certain materials to deal with the leakage of brine, had bailed out the locker before unloading it, and had placed plywood on the deck to prevent the drums from slipping—would be unable to avoid the obvious danger presented by the slippery condition of the deck, whether by requesting sawdust,[6] laying down more plywood, or taking other appropriate steps.

---

**6.** Significantly, it appears from the cases that when slippery conditions present a problem the

stevedore generally *requests* that the ship make the necessary material available. *See, e. g.,*

Giglio contends, however, that three recent cases dictate reversal. In my view all three cases are distinguishable. The first, *Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364 (2d Cir. 1978), held that the district court had, by directing a verdict for the defendant shipowner, improperly removed from the jury's consideration an issue of fact presented by ambiguous testimony. Lubrano, a longshoreman, had allegedly slipped while loading greasy drums of tallow in the hold of the ship. He claimed that his fall was caused by the absence of dunnage which was supposed to be supplied by the ship. This Court concluded that although

> the record was sparse and the testimony supporting plaintiff on this issue was ambiguous and unimpressive, it was enough to allow a jury to conclude that the ship's officer *approved and joined in the direction that the men keep working, although the dunnage was not there.* Had a jury so found, it *might* also have concluded, as we said in *Napoli*, "that the ship should reasonably have anticipated that . . . [plaintiff] would not be able to avoid the danger despite its obviousness."

572 F.2d at 367, *quoting Napoli, supra,* 536 F.2d at 509 (emphasis added). *Lubrano* is not controlling for several reasons. Most important, there is no evidence in the instant case, indeed there is no claim, either that the ship was requested to supply materials to counteract a slippery condition and failed promptly to do so or that the ship approved or joined in the direction that the men keep working until such material could be obtained. Moreover, *Lubrano* held only that where such evidence *was* presented, it was a question of fact whether under the circumstances the ship should reasonably have anticipated that the plaintiff would not have been able to avoid the danger despite its obviousness. In the instant case, of course, the factfinder was presented with this question and found that under the *Napoli* standard, the ship should not have an-

ticipated an inability on the part of appellant to avoid the danger.

Appellant's reliance on *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2d Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978), is equally misplaced. While walking through a narrow passageway on the deck of defendant's ship, Canizzo, a marine carpenter, slipped on a patch of grease which was covered by a pile of wires. After a bench trial, the district court found that the crew had placed the wires in the passageway, thereby creating a dangerous condition which the crew should have anticipated that workers like Canizzo would be unable to avoid. Noting that these findings, based in large part on the trial court's assessment of the witnesses' credibility, could not be characterized as clearly erroneous, this Court affirmed. Like *Lubrano, Canizzo* makes two points important to our consideration of Giglio's appeal. First, a ship's liability is to be determined by application of the *Napoli* test. Second, whether the ship's conduct constitutes negligence under the *Napoli* test is a question for the factfinder. Today's affirmance respects both these principles.

Giglio's invocation of *Lopez v. A/S D/S Svendborg,* 581 F.2d 319 (2d Cir. 1978), is also unavailing. Lopez was injured when he stepped on a loose bolt in the course of discharging cargo. Several kegs in the hold of the ship had broken open during the voyage and bolts had been scattered about. The district court, after plaintiff had rested, granted defendant's motion to dismiss the complaint. This Court, citing *Napoli,* held that there was sufficient evidence "to allow a jury to conclude that the ship's officer approved and joined in the direction that the men keep working . . . ." *Id.* at 324, *quoting Lubrano.* Applying the *Napoli* standard the *Lopez* Court concluded on these facts that the case should have been left to the jury because there was "sufficient evidence of knowledge by the shipowner of 'obvious dangers which it should

*Lubrano v. Royal Netherlands Steamship Co., supra,* 572 F.2d at 365 (request for dunnage); *Hickman v. Jugoslavenska Linijska, etc.,* 570

F.2d 449, 450 (2d Cir. 1978) (request for dunnage).

reasonably anticipate that the longshoremen would be unable to avoid . . . .' " *Id.* at 323.

The *Lopez* Court made clear that where the ship has been proven negligent, it cannot escape liability simply because the stevedore was also negligent. *Cf. Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979) (discussing ship's liability for concurrent negligence). Seizing on this principle, Giglio urges that the district court erroneously permitted the ship to avoid liability for its own negligence simply because the stevedore had also acted negligently. However, this argument is premised on a serious mischaracterization of Judge Lasker's conclusions. Judge Lasker determined that the ship had not in fact been negligent because it had not in fact acted unreasonably.

Nor did Judge Lasker err in referring to Judge Friendly's observation, in his *Canizzo* dissent, that:

> No decision of this court requires us to ignore the ship's justifiable reliance on the independent contractors to perform their duty.

579 F.2d 682, 689 (Friendly, *J.*, dissenting).[7] This factor, like many others, may be considered by the factfinder charged with judging the reasonableness of the ship's actions, or failure to act, in a particular situation. *See also Pastorello v. Koninklijke Nederl Stoomb Maats B. V.*, 456 F.Supp. 882, 887 (E.D.N.Y.1978) ("it is surely appropriate . . . to take into account the peculiar relationships between ship and stevedore.").

After reviewing both the law in this Circuit and the facts of this case, I believe that Judge Lasker correctly applied the correct test of liability. Appellant fails to cite any controlling precedent to the contrary.

Affirmed.

SIFTON, District Judge (concurring in result):

I concur with Judge Meskill in affirming the judgment of the District Court. I do so because, in my view, Judge Lasker found that the ship did not have constructive notice—and because there was no basis in the record for a finding of actual notice—of the presence of the slippery condition on the deck. That the ship did not have constructive notice of the condition which caused plaintiff's fall is a finding amply supported by the evidence which showed that, having undertaken to take care of the situation revealed on opening the second locker, the stevedore instead made it worse by rolling the leaking cargo across the deck where the brine became mixed with graphite spilled by the stevedore during the unloading of the first locker.

The dissent assumes that Judge Lasker did not make any factual finding with regard to the ship's notice of the condition on the deck which caused plaintiff's fall, but rather, decided the case on the basis of a legal conclusion that, even if the ship had notice, liability was appropriately placed with the stevedore by reason of the doctrine of primary and secondary responsibility set forth in Judge Friendly's dissent in *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 688–90 (2d Cir.), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

I find this assumption difficult to reconcile with Judge Lasker's statement in his opinion below that he was aware of the differing rules of law set forth in the dissent in *Canizzo* and in other cases in this Circuit, and his further statement that, in

---

7. Giglio contends that the district court improperly sought guidance in Judge Friendly's *Canizzo* opinion. However, citing a dissenting opinion is not, in this Circuit at least, an offense punishable by reversal, nor is everything said in dissent *ipso facto* inaccurate, bad law, or unwise. Although I voted with the majority in *Canizzo*, I agree with Judge Friendly's observation that it is appropriate to consider what may be reasonably expected of the stevedore in determining, under the circumstances, what dangers the ship should reasonably have anticipated the longshoremen would be unable to avoid. This observation does not negate the possibility recognized in *Lopez v. A/S D/S Svendborg, supra*, that in a given situation both the ship and the stevedore may have acted negligently.

the circumstances of this case, it would make no difference in result which of the differing legal theories he applied. To me, these statements make clear that the legal conclusion reached by Judge Lasker was not, as the dissent assumes, that the ship's responsibility is as a legal matter secondary to that of the stevedore, but rather, that on the facts shown here, including such factual matters as the existence of the Safety and Health Regulation for Longshoring, 29 C.F.R. 1918.91(c), placing certain responsibilities with regard to cleaning up slippery conditions on the stevedore, it would be unreasonable to conclude that the ship should have foreseen the sloppy procedures followed by the stevedore which resulted in the dangerous condition that caused plaintiff's fall.

OAKES, Circuit Judge (dissenting):

I respectfully dissent, although I would affirm the holding below that the vessel's failure to remove the spreader was not negligent.

The court below concluded that the shipowner was not negligent because it had reason to believe that the longshoremen were capable of curing and would cure the defective condition on deck. My view is that this ruling was erroneous in law and was in part based on omissions to find facts, and that this requires a remand for further consideration.

To begin with, the findings below appear to have confused the stevedore's responsibility in connection with the *locker* with its responsibility to clean the *deck*. In concluding that the longshoremen were capable of curing "the situation," the court relied partly on the undisputed fact that "[t]hey requested the necessary material to cure the situation." But the "situation" there described was the cleaning of the *locker*. (At the request of the longshoremen, the vessel supplied shovels and pails to enable the longshoremen to clean out the deep liquid in the locker.) There is no testimony whatsoever that the longshoremen requested material to make the deck safe. Indeed, in a related matter, the court responded to ap-

pellant's request for a finding with respect to the ship's notice of the presence of liquid from the sheep drums "in the locker and on the deck" by finding that the ship had actual notice of liquid "in or about the locker," but omitted to render any finding with respect to the deck.

Thus, it is incorrect to imagine any supposed communication between the stevedores and the crew concerning the slippery deck and to see that as a basis of the ship's reliance on the clean-up efforts of the stevedores. The only apparent communication concerned pails and shovels for cleaning the locker, which is an area that is less open and obvious than the deck and which is, in my view, one where the ship's responsibilities are probably therefore less extensive.

Another basis of the holding below was the trial judge's evident construction of the Safety and Health Regulations for Longshoring, 29 C.F.R. § 1918.91(c) (requiring the stevedore to secure the elimination of slippery conditions as they occur), as imposing an *exclusive* duty upon stevedores. *See Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364, 373–74 (2d Cir. 1978) (Moore, J., dissenting); *see also Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 688 (2d Cir. 1978) (Friendly, J., dissenting), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978) (33 U.S.C. § 941(a) imposes safety obligation on stevedore). But the regulations specifically provide that they do *not* relieve vessels "from responsibilities or duties now place upon them by law, regulation or custom." 29 C.F.R. § 1918.2(b). If the stevedore (and plaintiff) were contributorily negligent, the plaintiff's recovery against the vessel may be *reduced* under the principles of comparative negligence, but it should not be eliminated. *See Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 508 (2d Cir. 1976).

Once we reject the proposition that the shipowner, under the regulations, never has any responsibility for obvious, dangerous conditions on the deck of which the stevedore is aware, we must examine the record to determine whether the shipowner, in the

exercise of reasonable care, should have furnished sand, sawdust or some other material to cover the spill. Under *Napoli, supra,* the applicable standard is one based on *Restatement (Second) of Torts* § 343A. "Under this rule, a vessel is liable to longshoremen only for injuries resulting from obvious dangers which it should reasonably anticipate that the longshoremen would be unable to avoid." 536 F.2d at 509.

The question thus becomes when a ship must "reasonably anticipate" that even an obvious danger will not be avoided. Judge Friendly's "justifiable reliance" concept, discussed in his dissent in *Canizzo, supra,* 579 F.2d at 687, which the court below relied on—a reliance which the majority here seems to adopt—gives one answer. A ship, he says, may anticipate avoidance of the problem, justifiably relying on the stevedore to act, whenever the *reasonable, i. e.,* not negligent, course of action for the stevedore is so to act. In other words, the emphasis is shifted to the standard of conduct imposed on the stevedore. Whenever the stevedore would be negligent if it failed to correct the obvious danger, the argument runs, then reliance on the stevedore by the ship is justifiable and the ship itself is not, under *Napoli,* negligent. Or, as the court below put it, paraphrasing the *Canizzo* dissent, the ship is "entitled to assume that [the stevedore will] perform the job in a workmanlike fashion."

The problem with this version of the rule, which it seems to me the majority here adopts, is that it virtually eliminates the possibility of negligence on the part of the ship in obvious danger cases. Almost by definition, failure by a stevedore to correct an obvious danger constitutes negligence. As a result this version makes the *Napoli* rule equivalent to the older *Restatement* rule rejected in that case, 536 F.2d at 508; ships would never be liable for obvious risks. And since they are not in any event liable for risks as to which they are not chargeable with knowledge, their liability overall would be reduced to a practical nullity.

Application of the *Canizzo* dissent is plainly inconsistent with *Lopez v. A/S D/S Svendborg,* 581 F.2d 319 (2d Cir. 1978), which held that negligence on the part of a stevedore in the face of obvious dangers does not rule out imposition of some liability, through comparative negligence, on the ship. *Id.* at 325. More fundamentally, such application is in my view inconsistent with *Napoli* itself, where the court clearly intended that ships should sometimes be obliged to anticipate the negligence of stevedores and to act to prevent harm:

> Where dangers are unreasonable, their obviousness, standing alone, should not necessarily relieve a defendant of all responsibility for their presence. Although the invitee (or in this case the employee) *may be under a duty to avoid harm likely to result to him from open and obvious dangers,* he may not be in a position fully to appreciate the risk or to avoid the danger even though aware of it. For instance, his attention may be distracted or his duties as an employee may require his unavoidable exposure to it.

536 F.2d at 508 (emphasis added). Thus the reasonableness of a ship's inaction in the face of an obvious danger may depend on the level of danger involved, as well as on the *actual likelihood* that the stevedore will take the objectively reasonable course of action and avoid the particular harm.

An important factor in assessing the likelihood that the stevedore will act is the customary division of responsibilities with respect to a given risk. The majority opinion, at 433, notes the testimony of the hatch boss Gonelli that it was his job to keep the deck clean. But Gonelli testified immediately thereafter that he also saw to it that the *crew* or his coworkers kept the deck clean or clear. This testimony certainly does not indicate that the stevedore had exclusive or even primary responsibility in this area.

In fact, this ship shared a large measure of that responsibility. This ship was the source of sand or sawdust to cover spills. Moreover, Chief Mate Fitzpatrick testified:

> Q. Was it part of your duties to see that the deck area where the longshoremen had to work was safe?

A. Yes.

That it is the *ship's* duty is substantiated by Part C §§ 1, 37 and 38 of the Joint Maritime Safety Code prepared by the New York Shipping Association, Inc., the International Longshoremen's Association, and Port of New York Joint Safety Committee, which surely qualify under the Safety and Health Regulations as a "regulation or custom" and which read as follows:

   1. The owner, master and officers of the vessel shall supply and maintain in safe condition for use all ship's gear equipment, tools and work spaces which are to be used in stevedoring operations.

   37. Grease, oils, etc., spilled where operations are being carried on shall be immediately covered by sand or other suitable materials.

   38. A liberal supply of sand or other suitable material shall be kept readily available for use on slippery places.

The only testimony to the contrary is a nonresponsive answer by O'Connor, a stevedore superintendent, on recross that, although he doubted that the deck would have been wet from dew, "[i]f there is any slippage on the deck, I have to get sand to put it on it so there wouldn't be any slippage." O'Connor did not state that this is his *exclusive* responsibility, and counsel did not follow up the precise point.

This division of responsibility suggests that the longshoremen were quite likely in this case to rely on the crew to bring sand if necessary. Once the correct legal standard is applied, it is at least quite possible that the finder of facts would conclude that the ship should have anticipated that the longshoremen would take an undue risk and work on a slippery deck, rather than seek out a remedy from the ship's crew. I would remand for further findings here.

Further findings are also necessary with respect to one other issue: was this danger known to the ship or so obvious that the ship should have known about it? The evidence here is far from clear. The court below may have *meant* to find that the vessel had actual notice of the conditions of the deck as well as of the locker. But I do not believe there was any direct testimony that it had actual notice, and the Chief Mate testified to the contrary. I do not think we can now conclude, as a matter of law, that the slippery condition was open and obvious enough that the vessel can be charged with knowledge, although, because the vessel actually knew of the conditions in the locker, perhaps it could be charged with knowing that the drums would also leak on the deck. Rather I would remand on this point as well.[1]

---

1. Although the court also found that the vessel had no actual or constructive knowledge of the presence of graphite, this finding, even if correct, does not save the vessel from liability if it is chargeable with knowledge of the leaking drums on the deck, since the court found that the leaks were a contributing cause of the slipperiness.