**Pasquale FANETTI, Plaintiff-Appellee,**

v.

**HELLENIC LINES LTD.,**
**Defendant-Appellant.**

**No. 468, Docket 81–7500.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 14, 1982.

Decided May 6, 1982.

---

18. *See Buckley v. Valeo, supra*, 424 U.S. at 14, 96 S.Ct. at 632.

tin, New York City, of counsel), for defendant-appellant.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiff-appellee.

Before OAKES and NEWMAN, Circuit Judges, and HAIGHT,* District Judge.

HAIGHT, District Judge:

Hellenic Lines Ltd. ("Hellenic") appeals from a plaintiff's verdict following a jury trial in the United States District Court for the Southern District of New York, Constance Baker Motley, *Judge*, in an action brought under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950 (1976). The significant questions on the appeal concern Hellenic's liability, within the statutory scheme, as both shipowner and stevedore; and whether the calculation of lost future wages should be made on the basis of gross wages, or net wages after deduction for income taxes. We affirm.

### I.

On May 6, 1980, plaintiff Pasquale Fanetti was working as a longshoreman on board the M/V HELLENIC SPLENDOR, then berthed at Brooklyn, N. Y. Fanetti was part of a work gang, supervised by hatch boss Allesandro DeLiso, and engaged in loading containers at the No. 2 hatch. Fanetti operated a winch which swung one of the vessel's booms inshore and offshore.

Hellenic owned the HELLENIC SPLENDOR. It also acted as stevedore, procuring longshoremen labor directly from the union hiring hall in Brooklyn in accordance with the needs of Hellenic's vessels. The longshoremen thus hired were paid by Hellenic Lines Ltd. salary checks. This arrangement contrasts with the retention by a shipowner of an independent stevedoring contractor. Hellenic's commercial practice of assuming the dual roles of shipowner and stevedore has previously come to the attention of this Court. *Napoli v. TransPacific Carriers Corp.*, 536 F.2d 505 (2nd Cir. 1976).

Robert Alexander Hulten, New York City (Edwin K. Reid, Zock, Petrie, Reid & Cur-

---

* Of the Southern District of New York, sitting by designation.

Fanetti was injured at about 2:55 p. m. on May 6, as he was proceeding toward his place of work at the winch controls. The controls for the boom being used were located on a raised deck extending from the No. 2 hatch forward. Two ladders, one on the inshore side of the vessel and the other on the offshore side, gave access to the raised deck; the winch controls themselves were 10 feet forward of the hatch. Thus to get to the winch controls from a position on the deck aft of the hatch, one had to go up either of the two ladders, and then walk 10 feet to the controls. Fanetti, returning from a "blow" (rest period from work), climbed the offshore ladder and headed across the raised deck toward the winch controls. When he was about four feet away from the ladder, he slipped and fell, suffering the injuries complained of.

Fanetti alleged, and the jury was entitled to find, that the passageway he was required to transverse across the raised deck to get to his work site was obstructed by lashing gear, including greased and oily turnbuckles, chains and wires, and that the deck itself was oily and greasy. These hazards were generated by the actions of the vessel's crew. After the longshoremen finished loading the containers, the crew was responsible for lashing them securely in place. In preparation for that work crew members brought lashing equipment onto the raised deck and dumped it on the walkways. That equipment consisted of metal turnbuckles 2½–3 feet long, wires the thickness of a finger 20–25 feet long, and chains. These artifacts were greased and oiled to prevent rusting. When laid down upon the deck, they rendered portions of the deck oily and greasy. When the longshoremen commenced work at the No. 2 hatch at 8:00 a. m. there were a few turnbuckles on the

deck, but throughout the day the crew brought more lashing equipment and placed it on the raised deck, so that by the time of the accident in mid-afternoon the area from the ladders to the controls was so obstructed that one had to walk over the equipment to get to the controls. While so engaged, Fanetti slipped and fell.

Fanetti and his hatch boss DeLiso both testified that they complained to "seamen" or "crewman" about the obstructions, to no avail. There was no evidence that the condition was called to the attention of a ship's officer.

The jury, after hearing this evidence and medical testimony, returned a verdict in Fanetti's favor for $511,190. Hellenic moved for judgment n.o.v., remittitur or a new trial, all of which the District Judge denied. This appeal followed.

## II.

We do not understand Hellenic to dispute on the appeal that the vessel's crew, in the performance of work unrelated to the longshoremen's loading of cargo, created a condition on deck dangerous to the longshoremen who had to work there. Rather, Hellenic taxes the trial court with error in its jury charge by failing to distinguish between shipowner and stevedore safety responsibilities. That distinction, or as alternatively phrased, "[t]he dichotomy between shipowner and stevedoring functions" (Hellenic brief at 3), is said to apply with full force and effect even though Hellenic, opting not to hire an independent contractor, instead acted as its own stevedore. In the light of that distinction, the argument continues, Judge Motley's charge on the subject of Hellenic's duty to plaintiff *qua* shipowner [1] was inadequate. Hellenic views it-

1. That portion of the district court's charge relevant to the appeal reads as follows:

"Now the duty of a shipowner to a longshoreman in these circumstances is closely related to the duty owed by homeowner or property owner to one whom the homeowner or property owner invites into his premises. In inviting others onto his premises, the owner is considered to be offering some assurance to the invitee that the place is prepared for his reception and that reasonable care has been exercised to make it safe for his use. In this case, the property of the defendant is a vessel, a ship. That is not to say that the shipowner must make his vessel absolutely free of all dangers or hazards. The shipowner's duty in this case was to exercise reasonable care under the circumstances to provide a reasonably safe place for the longshoremen to work. This means that the shipowner

self as entitled to a charge based on the standards promulgated by this Court for the situation in which a shipowner hires an independent contracting stevedore. *Evans v. Transportation Maritime Mexicana SS. "CAMPECHE"*, 639 F.2d 848 (2d Cir. 1981), is cited as a recent, salutary example. *Evans*, following earlier cases decided by this Court, held that "a vessel is not liable for injuries resulting from known or obvious dangers unless the shipowner should anticipate the harm despite the obviousness of the danger," 639 F.2d at 855; the *"sine qua non* of a ship's liability for an obviously dangerous condition arising during the process of loading or unloading is reasonable anticipation that the longshoreman will not be able to avoid it." *Id.* at 856, quoting *Giglio v. Farrell Lines, Inc.*, 613 F.2d 429, 432–33 (2d Cir. 1980). "If a charge were given to the jury along the guidelines of the *Evans* case," Hellenic argues in its brief, "the verdict may have been for the shipowner rather than the plaintiff."

In particular, Hellenic argues that Judge Motley should have informed the jury that the stevedore bears the primary responsibility to correct dangerous conditions, and that the shipowner will often rely on the stevedore to do so. The charge is criticized for failing to discuss "the unique degree of anticipation to which the shipowner is entitled, based on its functional relationship

with its stevedore," brief at 8. In that regard, Hellenic complains that the judge did not inform the jury that the "stevedore" was responsible for insuring compliance with relevant safety and health regulations for longshoring.[2]

Even if the requested charge had been given, the exoneration of Hellenic on the evidence in this case is unlikely. Crew negligence created the hazard, just as in *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30 (2d Cir. 1980), where a longshoreman fell on deck as the result "of a general obstruction of the walking area by various types of refuse." *Id.* at 33. The shipowner in *Doca* hired an independent stevedoring contractor. The district court, trying the case without a jury, assessed 90% liability against the shipowner. We affirmed, observing that "[t]he ship's crew had created this hazard, and the ship was primarily responsible for it." *Ibid.*

Nonetheless, the independent stevedoring contractor in *Doca* bore the remaining 10% of liability because a regulation promulgated by the Occupational Safety and Health Administration, 29 C.F.R. § 1918.91(a) (1979), required stevedores to keep their work area free of "tripping or stumbling hazards"; we affirmed the district court's conclusion that the regulation created a non-delegable duty to remove the hazard, adding that "[t]he fact that the

must take remedial steps to protect longshoremen from concealed or non obvious defects, where the shipowner knows or should have known of the condition and should realize that it is an unreasonable risk of harm. "Now in this case it is not claimed that the shipowner failed to correct a concealed or non obvious defect. It is claimed that the shipowner knew of the dangerous condition created by the seamen, since it was an open and obvious situation. The shipowner is not liable for injuries resulting from known or obvious dangers, unless the shipowner should anticipate a harm despite the obviousness of danger . . ."

**2.** The particular instructions requested by Hellenic are as follows:

"8. It was the duty of the stevedore employer to furnish the plaintiff with a safe place to work. *29 C.F.R., Chapter XVII, Sections 1918.1 and 1918.2.*

"9. The safety and Health Regulations for longshoring provides that: 'Weather deck walking and working areas shall be kept reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards.' *(29 C.F.R., Chapter XVII, Section 1918.91(a).* "The safety and Health Regulations for Longshoring further provides: 'Slippery conditions shall be eliminated as they occur and loose paper, dunnage and debris shall be collected as the work progresses and be kept clear of the immediate work area.' *(29 C.F.R., Chapter XVII, Section 1918.91(c) and (d).*

"10. The responsibility for removing such hazards is on the stevedore. *(29 C.F.R., Section 1918.2(a), .3(c).*

"11. The shipowner had no duty to supervise the operations of the stevedore. Therefore, any failure of the stevedore to conduct its operations properly would not be the responsibility of the ship."

hazard was primarily the ship's responsibility does not excuse the stevedore from fulfilling its regulatory obligation," *ibid.* In the case at bar, we are not prepared to say that no reasonable jury could find that the obstruction was at a place where an independent contractor (if one existed) would have been expected to remove it. We therefore confront the question posed by Hellenic on this appeal: whether a shipowner choosing to act as its own stevedore is entitled to that insulation from liability, partial or total, which hiring an independent contractor might have afforded.

We answer that question in the negative, for the reason stated by Judge Friendly in *Napoli v. TransPacific Carriers Corp., supra,* 536 F.2d at 508, where Hellenic was also the shipowner:

> " . . . a charge which relieves a shipowner of liability for a dangerous condition which was 'known to the stevedore or to any of its employees' is clearly inappropriate where the shipowner, itself, is the stevedore."

See also *Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682, 689–90 (2d Cir. 1978), Friendly, J., dissenting:

> "Where, as in [*Napoli*], there is no independent contractor, it *is* part of the ship's duty to exercise reasonable care to inspect its own workers' workplace, to remove grease spills, etc. In such a case there is no 'independent contractor' with primary responsibility upon whom the ship may properly rely . . . Things are very different when the longshoreman works for an independent stevedore who has primary responsibility for the workplace." (emphasis in original).

The concept of stevedoring contractor as independent expert upon whom the shipowner may reasonably rely runs like a *leitmotiv* through the cases, most recently *Evans, supra,* 639 F.2d at 856:

> "In determining whether a shipowner should anticipate injury to longshoremen resulting from a known dangerous condition, courts must take into consideration the independent-contractor status of the stevedore. *See Giglio v. Farrell Lines,*

*Inc., supra,* 613 F.2d at 435; *Canizzo v. Farrell Lines, Inc., supra,* 579 F.2d at 688 (Friendly, J., dissenting). *Lubrano v. Royal Netherlands Steamship Co.,* [2nd Cir.] *supra,* 572 F.2d [364] at 372 (Moore, J., dissenting). *See also* Comment, *supra,* at 749, 751–52; Robertson, *supra,* at 451. The stevedore is specifically hired for its expertise in coping with the dangers inherent in loading and unloading cargo, and in many cases it will be perfectly reasonable for the shipowner to assume that the stevedore will correct the defect. *See Giglio v. Farrell Lines, Inc., supra,* 613 F.2d at 433; *Canizzo v. Farrell Lines, Inc., supra,* 579 F.2d at 689 (Friendly, J., dissenting) ('No decision of this court requires us to ignore the ship's justifiable reliance on the independent contractors to perform their duty.')."

■ A shipowner is, of course, at liberty to refrain from hiring an independent stevedoring contractor. Presumably it does so to save money. However, that saving is accomplished at the cost of not having an independent expert on board. As myriad cases in this field demonstrate, the presence of the expert independent stevedoring contractor furnishes the shipowner with significant protection, in the form of insulation from liability for its own acts which would otherwise attach. But the shipowner cannot save the premium and still claim the protection.

Hellenic argues that the analyses quoted from *Napoli* and *Canizzo* would never have been articulated if the Supreme Court's decision in *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), had then been available. We do not agree. In *Edmonds* the injured longshoreman was employed by an independent stevedoring company. The jury determined that he was responsible for 10% of the total negligence resulting in his injury, that the stevedore's fault, through a co-employee's negligence, contributed 70%, and that the shipowner was accountable for 20%. The district court reduced the longshoreman's recovery by 10%, but refused further to reduce the award against the

shipowner in proportion to the fault of the employer. The Fourth Circuit reversed and held the shipowner liable only for that share of the total damages equivalent to the ratio of its fault to the total fault, regarding that result as necessary to reconcile two sentences added as part of the 1972 amendments to LHWCA at 33 U.S.C. § 905(b). Those sentences read:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring in action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel."

The Supreme Court reversed and reinstated the judgment of the district court. The Court observed that the first sentence of § 905(b) was drafted by Congress to overrule the express or implied warranty of a stevedore's workmanlike service declared in *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), which could result in indemnification of the shipowner by the stevedore for the former's liability to the longshoreman. By overruling *Ryan*, the first sentence of § 905(b) "prevents the vessel from recouping from the stevedore any of the damages that the longshoreman may recover from the vessel." 443 U.S. at 264, 99 S.Ct. at 2758. The Court continued:

"But the sentence neither expressly nor implicitly purports to overrule or modify the traditional rule that the longshoreman may recover the total amount of his damages from the vessel if the latter's negligence is a contributing cause of his injury, even if the stevedore, whose limited liability is fixed by statute, is partly to blame." *Ibid.*

Rather than stopping there, the Court in *Edmonds* went on to analyze the second sentence of § 905(b). Although recognizing that application of the second sentence "is not involved in this case," *id.* at 265, 99 S.Ct. at 2758, the Court engaged in the analysis to deal with inconsistencies between the two sentences perceived by the Fourth Circuit. The Court stated:

"The second sentence of the paragraph is expressly addressed to the different and less familiar arrangement where the injured longshoreman loading or unloading the ship is employed by the vessel itself, not by a separate stevedoring company— in short, to the situation where the ship is its own stevedore. In this situation, the second sentence places some limitations on suits against the vessel for injuries caused during its stevedoring operations. Whatever these limitations may be, there is no conflict between the two sentences, and one arises only if the second sentence is read, as the Court of Appeals read it, as applying to all injured longshoremen, whether employed by the ship or by an independent stevedore. Nothing in the legislative history advises this construction of the sentence, and we see no reason to depart from the language of the statute in this respect." *Id.* at 264–65, 99 S.Ct. at 2758 (footnotes omitted).

To avoid any other practical difficulties, the Court continued:

"... it is necessary only to construe the second sentence to permit a third-party suit against the vessel providing its own loading and unloading services when negligence in its nonstevedoring capacity contributes to the injury. The second sentence means no more than that *all longshoremen are to be treated the same whether their employer is an independent stevedore or a shipowner-stevedore and that all stevedores are to be treated the same whether they are independent or an arm of the shipowner itself.*

"This leaves the question of the measure of recovery against a shipowner, whether or not it is doing its own stevedoring,

when as shipowner it is only partially responsible for the negligence, but we are quite unable to distill from the face of the obviously awkward wording of the two sentences any indication that Congress intended to modify the pre-existing rule that a longshoreman who is injured by the concurrent negligence of the stevedore and the ship may recover for the entire amount of his injuries from the ship." *Id.* at 266, 99 S.Ct. at 2759 (emphasis added).

Hellenic relies upon the italicized language as supporting its contention that a shipowner acting as its own stevedore should be entitled to rely upon itself as expert stevedoring contractor, thereby insulating itself from the consequences of its negligence as shipowner. Additional authority for this proposition is also said to be found in the legislative history of the 1972 amendments.[3] In our view, however, the *Edmonds* Court's attempted clarification of "the obviously awkward wording of the two sentences" of this statute should not be so far removed from the context in which it was given as to require what we continue to consider, with Judge Friendly in *Napoli* and *Canizzo,* an illogical result. The Court's purpose in *Edmonds* was to achieve a statutory construction which would permit an injured longshoreman to recover his full damages from a shipowner only concurrently negligent. That was also the thrust of the legislative history, with its articulated

belief "that the rights of an injured longshoreman . . . shall not depend on whether he was employed directly by the vessel or by an independent contractor." That salutary purpose may be preserved without requiring trial judges to give juries instructions about the shipowner's right to rely upon an expert contractor who, in fact, was not there. The concept is schizophrenic and the predictable effect upon the jury one of bafflement. The Supreme Court itself, in the later case of *Scindia Steam & Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), emphasized that "the legal duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed are relevant in determining whether the shipowner has breached its duty." *Id.* at 176, 101 S.Ct. at 1626. Implicit in that analysis is the existence of an independent, expert stevedore upon whom the shipowner's "justifiable expectations" may reasonably fall. In those circumstances, and as Judge Friendly said in *Canizzo,* "[t]hings are very different"; and we do not read in *Edmonds* anything which requires us to accede to Hellenic's request that illusion be substituted for reality.

We hold that the requested charge is not appropriate where, as here, the shipowner acted as its own stevedore. In consequence, we find no error with the district court's instructions.[4]

3. S.Rep.No.92–1125 (1972) states at pp. 11–12: "The Committee believes that the rights of an injured longshoreman . . . shall not depend on whether he was employed directly by the vessel or by an independent contractor. Accordingly the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services . . . The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen . . . as apply when an independent contractor employs such persons."

4. *Albergo v. Hellenic Lines, Inc.,* 658 F.2d 66 (2d Cir. 1981), also relied on by Hellenic, is not to the contrary. *Albergo* affirmed the district court's grant of judgment n.o.v. to defendant

because "as a matter of law there was no factual or legal basis for an anticipation by the ship that the plaintiff would be unable to avoid the claimed hazard despite its obviousness and the way he himself dealt with it." The decision continues:

"The simple act performed by the plaintiff of moving the skinny rope cuttings aside with his hand from the area where he had to shackle, which was the area of the accident, eloquently strikes down any notion of the existence of a negligent condition for which the vessel owner could be held in damages. As a matter of law there was no such negligent condition nor any basis for anticipation that the longshoreman could not avoid the rope in this case—certainly not one remaining at any time after plaintiff cleared the untidy condition impeding him." *Id.* at 69. Hellenic was the defendant in *Albergo,* and again acted as its own stevedore. While lan-

### III.

 Hellenic complains of the district judge's charge on the subject of income taxes. The court's charge on that subject in its entirety was as follows:

"If you make an award to the plaintiff, the amount so awarded is not subject to federal or state income taxes and no amount may be added to the award believing that such taxes would be due."

Hellenic made no objection to the charge as given. However, in a post-verdict motion it asserted that a new trial was required because the jury was not also instructed to deduct future income taxes from its determination of the amount of future lost wages. Reliance was placed upon *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

*Liepelt*, a death action brought under the Federal Employers' Liability Act ("FELA"), held that the trial court erred in excluding the defendant's proffered testimony of an expert witness that the decedent's federal income taxes, during the period of lost future wages, would have amounted to a particular figure, which defendant wished to urge in reduction of damages. The Court held in *Liepelt* that under the FELA, the measure of recovery is the damages that flow from the deprivation of the pecuniary benefits which the beneficiaries might have reasonably received. Since it is after-tax income, rather than gross income before taxes, that provides the only realistic measure of a wage earner's ability to support his family, it necessarily follows "that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies." 444 U.S. at 493–94, 100 S.Ct. at 757–58. The Court rejected "the notion that the introduction

of evidence describing a decedent's estimated after-tax earnings is too speculative or complex for a jury," *ibid.*, and remanded the case for further proceedings consistent with its opinion.[5]

Although for the reasons stated *infra* Hellenic is not in a position to benefit from it, we take this opportunity to extend the *Liepelt* decision at least to all claims for future wages based solely on federal law. In *McWeeney v. New York, New Haven & Hartford R. R. Co.*, 282 F.2d 34 (2d Cir.) (*en banc*), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), an FELA case, we held that the district court had not committed error in refusing defendant's request that the jury be instructed to "calculate any past or future loss of earnings on the basis of [plaintiff's] net income after deduction of income taxes." *Id.* at 35. But Judge Lumbard's dissenting observation—"it seems to me that it is manifestly unfair to a defendant to ignore the substantial item of income tax payments on future income," *id.* at 43—forecast the Supreme Court's identical conclusion in *Liepelt*; and we see no basis for distinguishing in this regard between FELA and LHWCA cases. Focusing upon after-tax earnings is an exercise in economic fairness; by this decision we extend it at least to all federal law claims for future lost wages. Cf. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 101 S.Ct. 2870, 2880, 69 L.Ed.2d 784 (1981), a personal injury case arising under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, ("OCSLA"), in which the Court characterized the *Liepelt* instruction that damage awards are not subject to federal income taxation as an instruction which furthers "strong federal policies of fairness and efficiency in litigation of federal claims."[6]

guage in the opinion could be read as recognizing the shipowner/stevedore dichotomy, the context was entirely different. Unlike the case at bar, *Albergo* did not involve injury to a longshoreman resulting from a hazardous condition created by crew negligence. We do not regard *Albergo* as apposite to the question presented here.

5. The second point of decision in *Liepelt* was that a defendant is entitled to a jury instruction that the award of damages would not be subject to income taxation. 444 U.S. at 496–98, 100 S.Ct. at 759–60. As noted *supra*, Judge Motley gave that instruction in the case at bar.

6. *Gulf Offshore Co.* did not consider the applicability to OCSLA cases of *Liepelt's* holding that defendant is entitled to introduce evidence

However, to take advantage of the after-tax principle, a defendant must invoke it in timely and proper fashion. In the case at bar, Hellenic cited *Liepelt* in its original request that the judge charge the jury:

"If you find that plaintiff's damages from his accident include lost wages, then you must subtract the amount of income taxes plaintiff would have had to pay on those lost wages."

But Hellenic, unlike the defendant in *Liepelt*, offered no evidence to establish what amount of future taxes plaintiff would have incurred.[7] Hellenic did not seek a stipulation from plaintiff on the point before resting its case. While plaintiff's more recent tax returns had been received in evidence to prove his past earnings, Hellenic did not indicate before the evidence closed that it would rely on those returns to quantify future taxes, thereby depriving plaintiff of an opportunity to offer his own evidence, expert or otherwise, of what his future taxes might be. For that reason we reject Hellenic's argument that the trial judge should have instructed the jury on the basis of the past tax returns, or used them to make future tax calculations herself. Finally, Hellenic did not object to the charge ultimately given by the district court on the general subject of taxes. In these circumstances, Hellenic is not entitled to relief on appeal.

For the future guidance of the district courts and trial bar, we hold that a defendant confronted with a claim for future lost wages is entitled to an after-tax charge based on *Liepelt* when there is present in the record a stipulation of future taxes; or evidence of future taxes; or evidence of past taxes, in which event the jury should be instructed that it is entitled to assume a future tax amount or tax percentage of wages comparable to the past tax years.[8]

We have considered Hellenic's other points on appeal, and find them without merit.

Affirmed.

---

showing the effect of income taxes on plaintiff's future earnings. 101 S.Ct. at 2879 n.14. We leave for another day a defendant's entitlement to a *Liepelt* charge where federal jurisdiction is based solely on diversity of citizenship. Again, cf. *Gulf Offshore Co.*, where the Court, in view of the particular federal/state choice of law provisions in OCSLA, remanded the case for a determination of whether Louisiana law required the instruction and, if it did not, whether *Liepelt* displaced the state rule in an OCSLA case. *Id.* at 2880.

7. Some of the factors to be considered in the calculation of future taxes are summarized in *Liepelt* at 494, 100 S.Ct. at 758:

"Admittedly there are many variables that may affect the amount of a wage earner's future income-tax liability. The law may change, his family may increase or decrease in size, his spouse's earnings may affect his tax bracket, and extra income or unforeseen deductions may become available. But future employment itself, future health, future personal expenditures, future interest rates, and future inflation are also matters of esti-

mate and prediction. Any one of these issues might provide the basis for protracted expert testimony and debate. But the practical wisdom of the trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life."

8. Some flexibility may be required. Typically in such cases the evidence of past earnings takes the form of W-2 forms showing gross wages and withheld taxes for a calendar year. If the year in which the accident in suit occurred is included in the proof, it must be *discounted as an economic barometer*, since earnings in that accident-interrupted year will be less than normal, and the tax indebtedness accordingly uncharacteristic.

Application of this rule to the case at bar would not have been fair, since prior to the ruling we announce today plaintiff had no way of knowing that we would permit such a charge in such circumstances and under such an assumption.