Orazio **ALBERGO, Plaintiff-Appellant,**

v.

**HELLENIC LINES, INC.,**
**Defendant-Appellee.**

No. 1244, Docket 81–7006.

United States Court of Appeals,
Second Circuit.

Argued April 24, 1981.

Decided Aug. 21, 1981.

---

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, Attys.), for plaintiff-appellant.

Edwin K. Reid, New York City (Robert Alexander Hulten, New York City, of counsel, Zock, Petrie, Reid & Curtin, New York City, Attys.), for defendant-appellee.

Before LUMBARD and OAKES, Circuit Judges, and POLLACK,* District Judge.

POLLACK, District Judge:

Orazio Albergo, a longshoreman employed by Hellenic Lines, Inc., tripped over loose lashing rope scattered on the deck of a ship being off-loaded by stevedores and fell suffering injury. Pursuant to § 905(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1976), Albergo brought this third-party negligence action against the vessel owner in the United States District Court for the Southern District of New York. After a five day trial, the jury returned a verdict of $80,000 in favor of Albergo and found that plaintiff's negligence contributed to the accident to the extent of 25%. Judge Sweet set aside the jury's verdict and granted judgment N.O.V. to the defendant dismissing the complaint on the grounds that the open, obvious and known scattering of loose cuttings of lashing rope on the deck which plaintiff himself had pushed aside with his hand just before the accident did not present a negligent condition in the work area or pose an unavoidable danger to the stevedoring crew and their operation and could not legally support a charge of negligence against the vessel. Plaintiff appeals. We affirm.

Plaintiff, 58 years of age at the time of the accident, started out as a winch operator in stevedoring operations but due to an injury in 1956 in that capacity he became a stevedore's deckman. The accident sued on is plaintiff's fourth instance and claim of injury as a longshoreman.

On April 24, 1978 defendant's vessel, the Hellenic Leader, was discharging cargo at a pier in Brooklyn, New York using plaintiff and other longshoremen as deckmen employed by Hellenic Lines in its stevedoring capacity. The men started work at 8 A.M. on that day. Their task initially was to rig up and remove deck cargo consisting of containers and cartons from the main deck, located inshore and offshore. The cargo was lashed together with "skinny ropes" [so styled by plaintiff] that were cut from the containers by the ship's crew during the stevedoring operation; the cuttings were left strewn on the deck. The lashings on the offshore deck cargo were cut by the ship's crew while the longshoremen worked

---

* Honorable Milton Pollack of the United States District Court for the Southern District of New York, sitting by designation.

the inshore deck cargo, to ready the off-shore containers to be moved. There were two or three vans on the offshore side. The cuttings were open and obvious to the longshoremen. This was not an unusual way of unlashing cargo; plaintiff testified that on other occasions he had seen crews leaving cuttings of such ropes on the decks.

Having completed the removal of the inshore cargo, the stevedores moved to respot the up and down boom to the offshore side. However, the work plan was changed before the offshore containers were moved; the men were told to leave the offshore deck cargo for later on and instead, to raise the cargo from the hold in Hatch # 5. In the respotting process the preventer guy was slacked off so that plaintiff could fasten it to the deck (through a pad-eye). Plaintiff shackled the preventer guy to the deck and the slack was taken up. He was then told to recheck the fastening and did so and in turning away from the preventer, the fall, which caused this law suit, occurred.

Though the testimony was imprecise and vague concerning the manner of the occurrence, leaving much to the imagination, the evidence showed that prior to initially fastening the preventer guy to the deck, the plaintiff found lashing rope cuttings from the containers strewn in that part of the deck area where the preventer was to be fastened and he swept these "skinny rope" cuttings aside with his hand from the place where he had to do the shackling which he testified he did "just to clean up that very area there, just to move the shackling through the pad-eye." The guy was then loosened up by the winchman and the plaintiff turned the lock down on the preventer, the boom was raised and it was stopped when it reached the top and was fast and the plaintiff then locked up the guy. Plaintiff stood up and told the signalman that it was okay. He was asked by his co-worker to "give it another check". Plaintiff gave the guy a second check in the very area from which he had just swept away the rope, and then announced, "It's okay, it's locked". Plaintiff then turned around to leave that very area he had cleared but

according to his testimony he nevertheless tripped on some rope and fell down. Plaintiff testified that when he went into this area there were rope cuttings in between and around his feet and that he moved some of it so it wouldn't be over the shackle. He testified he had seen it before; "we worked on ropes all morning." When he got to the timekeeper's office he told him that he had tripped over a pad-eye covered with lashings.

■ The crux of the claim of negligence against the vessel is whether the presence of rope cuttings on the deck that plaintiff undertook to move with his hand to clear his work space can legally support a charge of third-party negligence against the vessel. Loose rope as such has no inherent mobility or dangerous propensities—not tied down, and left lying under foot openly and obviously it does not, in and of itself on a ship, pose an unreasonable risk of harm. As a matter of law a charge of negligence of the vessel can only be predicated on hazardous conditions or circumstances and not on ordinary clumsiness of movement of the longshoreman. The case might be different under the discarded theory of unseaworthiness which was a liability of a vessel eliminated in 1972 by the Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* during cargo operations.

In his opinion the Judge said

as a matter of law the ship is not required to provide an immaculate working place, *see Giglio v. Farrell Lines* [613 F.2d 429 (2d Cir. 1980)]; *Hickman v. Jugoslavenska Linijsk Plovidba Rigcka, Zvir*, 570 F.2d 449 (2d Cir. 1978), and if there is ever anything to be expected aboard a vessel, it is a line. There is simply no basis in fact upon which a jury could conclude that the cut line was a dangerous condition that the ship could reasonably conclude could not be avoided, particularly since Albergo had in fact avoided it once.

The Judge went on to say

... There is but one conclusion reasonable men could have reached here: that is,

that Hellenic could reasonably have expected Albergo to avoid the cut line. Since Albergo could have avoided the cut line, Hellenic, in failing to remove it, did not deviate from the standard of care imposed upon it by the law of this Circuit.

■ The place of plaintiff's employment was an area in which the law has imposed on the stevedore the primary obligation, as a matter of "Housekeeping", to "be kept reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards". 29 C.F.R. § 1918.1(a) [OSHA]. The duty to clear away any loose debris when that can be done as plaintiff did it here, is placed squarely on the stevedore employer, not the vessel owner. Thus, the danger to be perceived, if any, spells the duty of the stevedore to be observed. With the duty on the plaintiff's employer it would be contradictory to suggest that loose debris of the sort here involved, so easily removable as it was here, by hand, can establish liability for negligence on the part of the vessel owner. The longshoreman is adequately protected by looking to his employer for compensation when injured by accident. *Evans v. Transportacion Maritime Mexicana SS "Campeche"*, 639 F.2d 848 (2d Cir. 1981) held that the ship owner could consider the stevedore to be primarily responsible for the safety of the longshoremen and to be obligated to take whatever steps are necessary to correct even an "unsafe" condition aboard the ship. Thus, this is a case, where on the testimony adduced, it must be said that as a matter of law there was no factual or legal basis for an anticipation by the ship that the plaintiff would be unable to avoid the claimed hazard despite its obviousness and the way he himself dealt with it.

The appellee cogently argues that a vessel owner is entitled, as a matter of law, to anticipate that the stevedore and his longshoremen will abide by the OSHA regulations in such a case, and take whatever steps are necessary to correct an untidy condition aboard the ship; otherwise, longshoremen such as appellant, will know they can ignore the statutes, receive compensation from the stevedore and then try for even more money by suing the vessel owner. Appellee correctly says that, "Misplacement of the statutory standard will destroy the 'delicate balance' for safety which . . . Congress sought to establish . . . and adjust the ship owner's liability to that of an insurer". As stated by this Circuit in *Evans*, 639 F.2d at 852:

> Finally, Congress made clear that the stevedore is to have the primary responsibility for the safety of the longshoremen. Section 941 requires the stevedore to "furnish and maintain employment and places of employment which shall be reasonably safe for his employees" and to comply with the regulations promulgated under the Act. 33 U.S.C. § 941(a) (1976).

The simple act performed by the plaintiff of moving the skinny rope cuttings aside with his hand from the area where he had to shackle, which was the area of the accident, eloquently strikes down any notion of the existence of a negligent condition for which the vessel owner could be held in damages. As a matter of law there was no such negligent condition nor any basis for anticipation that the longshoreman could not avoid the rope in this case—certainly not one remaining at any time after plaintiff cleared the untidy condition impeding him.

Judgment affirmed.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

I adhere to what I said in my dissenting opinion in *Giglio v. Farrell Lines, Inc.*, 613 F.2d 429, 436 (2d Cir. 1980). I there pointed out that the trial judge's construction of the Safety and Health Regulations for Longshoring (there 29 C.F.R. § 1918.91(c), here 29 C.F.R. § 1918.91(a)), also relied upon by the panel majority here, does not impose an *exclusive* duty upon stevedores. *See Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364, 373–74 (2d Cir. 1978) (Moore, J. dissenting); *see also Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682–88 (2d Cir. 1978) (Friendly, J. dissenting), *cert. denied*, 439

U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). The Safety and Health Regulations specifically provide that they do not relieve vessels "from responsibilities or duties now placed upon them by law, regulation or custom." 29 C.F.R. § 1918.2(b). If the stevedore and his employees are contributorily negligent, the liability recovery against the vessel may be reduced under the principles of comparative negligence, but not eliminated. *See Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 508 (2d Cir. 1976).

Here as in *Giglio* it was the ship's duty as substantiated by the Joint Maritime Safety Code prepared by New York Shipping Association, Inc., International Longshoremen's Association, and the Port of New York Joint Safety Committee, with an effective date of January 1, 1970, of which the trial court took "judicial notice," to keep the "[w]eather deck, walking and working areas . . . reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards." *See* Part Q. Moreover, under Part C of the Code:

> The owner, master and officers of the vessel shall supply and maintain in safe condition for use all ship's gear, equipment, tools and *work spaces* which are to be used in stevedoring operations. (Emphasis added).

In my view, as I said in the *Giglio* dissent, *supra*, 613 F.2d at 438, the Safety Code qualifies under the Safety and Health Regulations as a regulation or custom for the maritime industries in the Port of New York. Moreover, the union contract with the New York Shipping Association in evidence states that the Joint Safety Code must be followed, and Hellenic Lines was a signatory to this contract. As the trial court indicated, the appellees could not disclaim knowledge of the New York standard of care in the maritime industry because it was a participant in one of the two organizations propounding the Safety Code Regulations.

In short the vessel did not comply with its duties under the Safety Code. Its duty exists independent of the stevedore's own duties under the OSHA regulations. The majority opinion speaks without any reference to the Joint Safety Code whatsoever and certainly disregards its impact on this case.

I note that Judge Sifton's concurring opinion in *Giglio v. Farrell Lines, supra*, at least implies that the ship's responsibility is not secondary to that of the stevedore, 613 F.2d at 436, and while our rules prevent my citation as authority to *Irizzary v. Compania Maritime Navegacion Netumar S.A.*, 628 F.2d 1345 (2d Cir. 1980), *cert. denied*, 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 347 (1981), since it was not a published opinion, I believe it is proper to note that in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, —— U.S. ——, —— n.25, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981), the *Irizzary* decision's holding that the Joint Safety Code was a custom or practice within the OSHA Safety Regulations was "note[d] with some interest" by the Supreme Court but not ruled upon. Certainly until the Supreme Court rules otherwise, the point I made in the *Giglio* dissent is an open one.

Following the analysis there set forth, 613 F.2d at 436–37, the question then becomes whether in the exercise of reasonable care the ship should have cleaned up the loose lines. *See Napoli, supra*, 536 F.2d at 509; Restatement (Second) of Tort § 343A. This court's own decision in *Lopez v. A/S D/S Svendborg*, 581 F.2d 319 (2d Cir. 1978), as well as *Napoli* itself, permit the imposition of liability, on a comparative negligence basis, on the vessel for dangers obvious to the stevedore, where as here custom or practice (The Joint Safety Code) makes the vessel responsible and the longshoreman relies on the vessel to eliminate the danger. Here there was ample evidence for the jury to find, as it did find, that Albergo did so rely. He was working in close quarters with maybe a "foot, foot and a half" between the ship's rail and the van where the pad eye for the schooner rope was located. "It wasn't [his] job to [push the loose rope to one side]". His fellow worker, Tony Lavadera, had previously told the mate to clean up the deck because it was the ship's job and the loose ropes left a dangerous condition—as Albergo himself described it, "like when you walk on the snow."

Under what I think was basically a proper charge the jury found the vessel negligent, its negligence the proximate cause of the accident, and Albergo twenty-five per cent contributorily negligent. I believe the law requires that the jury verdict stand.

Purely as an aside, I fail to understand the relevancy of the majority's point that Mr. Albergo had three previous claims for injury. I do not find this in the slightest surprising; the man was fifty-eight years old at the time of this accident, he had been a longshoreman for twenty-nine years, and it is well known that a longshoreman's work is one of the most hazardous of any. The present case is simply another example. A longshoreman is expected to step over 20 to 30 loose pieces of rope totalling some 300 to 400 feet in length thrown haphazardly in a narrow little space to loosen and resecure the preventer on a padeye to respot the up and down boom so that the men could work in the hold. It was the ship's equipment to be secured to the padeye. The ship knew some longshoreman would have to go into the narrow space with the loose rope obstructions but did nothing. Thus, Albergo's fourth claim, which the majority now denies. Only its merits are relevant, I think.