Martino LIEGGI, Plaintiff-Appellee,

v.

MARITIME COMPANY OF the PHILIP-
PINES, "M/V PHILIPPINE RIZAL,"
Defendant-Appellant.

No. 54, Docket 81–7053.

United States Court of Appeals,
Second Circuit.

Argued Sept. 22, 1981.
Decided Dec. 23, 1981.

Thomas H. Healey, New York City
(Ralph P. Cosentino, Healey & McCaffrey,
New York City, on the brief), for defend-
ant-appellant.

Irving B. Bushlow, Brooklyn, N. Y., for plaintiff-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and DALY,[*] District Judge.

KEARSE, Circuit Judge:

Defendant-appellant Maritime Company of the Philippines ("Maritime") appeals from a judgment of the United States District Court for the Eastern District of New York, Mark A. Costantino, *Judge*, entered on jury verdicts awarding $43,675 in damages to plaintiff-appellee Martino Lieggi for injuries he suffered while working as a longshoreman on the M/V PHILIPPINE RIZAL ("RIZAL"), a ship owned by Maritime. Lieggi charged that his injuries resulted from the negligence of Maritime, which was actionable under § 5(b) of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA" or the "Act"), as amended in 1972, 33 U.S.C. § 905(b) (1976). On appeal Maritime challenges the failure of the district judge to grant its motions pursuant to Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdicts. For the reasons below, we affirm.

## BACKGROUND

For the most part, the material facts are not in dispute. On the evening of the accident, July 11, 1973, Lieggi was working as a longshoreman on the RIZAL. He was employed by International Terminal Operating Company, a company hired by Maritime to perform stevedoring operations aboard the ship. Having worked on a different ship during the day, at about 5:00 p. m. Lieggi joined a four-man gang to unload cargo from the RIZAL. The gang's duties in-

volved work on the main deck and the operation of a winch located on a platform above the deck.[1] Rotating in performing the two types of work, the men moved back and forth between the main deck and the winch platform, which were connected by a ladder at the aft end of the platform. The platform measured approximately twenty by thirty feet; on the evening of the accident, there was spread out on a substantial portion of this area a greased wire or cable, about 100 feet long and one-fourth inch in diameter. The wire was a topping lift, part of the ship's gear, which had been lubricated periodically with grease by members of the ship's crew. Topping lifts are used in cargo operations, *see* note 1 *supra*, and this one had been used earlier in the day by a different gang of longshoremen, who had failed to put it away. On the platform near the wire were four-to-six spots of oil or grease, presumably left by the wire, varying in diameter from five to ten inches.

When Lieggi first joined the RIZAL gang they were using a winch located at the aft end of the platform, i.e., the end near the ladder. When that winch burned out, the gang had to use the winch at the forward end of the platform. To reach the forward winch after climbing the ladder from the deck, one had to cross the platform and pass through the wire and the grease. At about 6:10 p. m., after encountering these obstacles for the first time, Lieggi complained to the "hatch boss," the longshoreman in charge of the gang. The hatch boss then located the ship's mate, and he and the mate went together to inspect the platform. The mate, after seeing the wire and the grease, stated that he would have it cleaned up.[2] The hatch boss directed Lieggi to con-

---

[*] Honorable T. F. Gilroy Daly, of the United States District Court for the District of Connecticut, sitting by designation.

1. A winch is a machine that controls the movement of a freely hanging wire or cable, one end of which is attached to a boom, with the hanging end attached to a hook for holding cargo. The boom—a pole projecting from the ship's masthead—is rigged to another cable, called a topping lift, attached to the masthead.

2. Maritime obliquely attacks Lieggi's proof that the person who stated that he would have the wire and grease removed was really a mate. Lieggi testified that the man was wearing a uniform, and the hatch boss testified that he had sought and found the ship's mate and brought him to view the platform, and that the mate said he would have someone clean up the platform. Defendant presented no evidence to suggest that none of the RIZAL's mates had made such an undertaking. Viewing the evidence in the light most favorable to the plain-

tinue working, and the mate, who the jury could have found was still present, said nothing further. The wire and grease were never cleaned up, however, and although Lieggi successfully traversed the platform while there was still daylight, at approximately 11:00 p. m. he tripped and slipped on the wires and the grease, incurring the injuries that are the subject of this lawsuit.[3]

Separate trials were held on the questions of liability and damages. At the close of the plaintiff's case at the liability trial, Maritime moved to dismiss on the ground that Lieggi had not presented evidence sufficient to support a judgment in his favor. The district court denied this motion, and the jury returned a verdict finding Maritime 90% liable for the accident and Lieggi 10% liable. Maritime moved to set aside the verdict as being contrary to the law and against the weight of the evidence, and sought judgment in its favor notwithstanding the verdict. Its motion was denied. At the subsequent trial of the damages issues, the jury awarded Lieggi $43,675. Maritime moved to set aside this verdict as against the weight of the evidence and excessive. This motion too was denied.

On appeal Maritime argues principally that, as a matter of law, it cannot be held liable for Lieggi's injuries because it was entitled to rely on the stevedore to cure the hazardous conditions that caused the injuries.[4] We find no merit in this contention.

## DISCUSSION

Prior to 1972, a longshoreman injured in the course of his employment had several bases on which he could recover for his injuries. First, he could receive compensation payments, in accordance with a modest scale, from his employer, the stevedoring company, regardless of the fault of the stevedore. In addition, the longshoreman could bring an action against the owner of the ship and could recover if he could prove that he had been injured either because the owner was negligent or because the ship was unseaworthy. Unseaworthiness could be proven merely by showing that a dangerous condition existed on the ship; no showing of fault on the part of the owner was necessary, and even if the unsafe condition had been created by the stevedore, the shipowner was liable for the longshoreman's injuries.[5] See generally Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

In 1972, Congress amended the LHWCA, significantly altering the longshoreman's avenues to recovery. See 33 U.S.C. §§ 901–950 (1976). Under § 904, a longshoreman injured in the course of his employment still

---

tiff, as we must in reviewing the denial of a defendant's motion for judgment notwithstanding the verdict, we conclude that there was sufficient evidence from which a rational jury could infer that the person in question was one of the RIZAL's mates.

3. After Lieggi's accident, the hatch boss, who was about to take Lieggi's place in the four-man gang, summoned the ship's mate again to ask that the wire and grease be removed. The mate still did not cause the condition to be cleaned up, but did provide lighting for the area.

4. Maritime also argues that the award of $43,-675 was excessive. Because we find that, in light of the evidence presented at trial, this amount is not so high as to constitute a "denial of justice," Dagnello v. Long Island Rail Road Co., 289 F.2d 797, 806 (2d Cir. 1961), we uphold the district court's denial of the motion for judgment notwithstanding the verdict on damages.

5. If the dangerous condition had been caused by the stevedore or its employees, however, the shipowner was entitled to indemnity from the stevedore. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). This right of indemnity was expressly eliminated in 1972. The pre-1972 statutory scheme, and the changes instituted by the 1972 amendments, have been thoroughly discussed in the cases. See, e.g., Scindia Steam Navigation Co. v. De Los Santos, supra, 101 S.Ct. at 1620–21; Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 259–62, 99 S.Ct. 2753, 2756–58, 61 L.Ed.2d 521 (1979); Evans v. Transportacion Maritime Mexicana SS "Campeche", 639 F.2d 848, 851–52 (2d Cir. 1981); Giglio v. Farrell Lines Inc., 613 F.2d 429, 431 (2d Cir. 1980); Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837, 839–40 (2d Cir. 1977); Napoli v. Hellenic Lines, Ltd., 536 F.2d 505, 506–07 (2d Cir. 1976).

may recover compensation payments from the stevedore regardless of fault, and the scale of those payments has been sharply increased. As against the owner of the vessel, however, § 905(b), which is set forth in pertinent part in the margin,[6] provides that the longshoreman may recover only if he can show that his injuries resulted from the owner's negligence.

In amending § 905(b), Congress did not specify what would constitute shipowner negligence, preferring instead to leave its definition to be "resolved through the application of accepted principles of tort law[7] and the ordinary process of litigation." S.Rep.No. 92–1125, 92d Cong., 2d Sess. 11 (1972); H.R.Rep.No. 92–1441, 92d Cong., 2d Sess. 7 (1972), U.S.Code Cong. & Admin. News 1972, pp. 4698, 4704. Nor did Congress make clear the interrelation between the duty owed the longshoremen by the shipowner, and that owed by the stevedore. In particular, it left unclear exactly what duty the shipowner owes the longshoremen once cargo operations, over which the stevedore generally has primary control, have begun.

■ The "ordinary process of litigation" has produced considerable disagreement as to the precise contours of shipowner liability under § 905(b), *e.g., compare Evans v. Transportacion Maritime Mexicana SS "Campeche"*, 639 F.2d 848, 855–57 (2d Cir. 1981), and *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 508–09 (2d Cir. 1976), *with Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1250–53 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), and *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334 (1st Cir. 1980), and the Supreme Court has spoken definitively only as to a segment of the vessel owner's liability under that section, *see Scindia Steam Navigation Co. v. De Los Santos, supra*. Nevertheless, a few principles have emerged with reasonable clarity. First, the primary responsibility for the safety of the longshoremen rests upon the stevedore:

> As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards. Section 41 of the Act, 33 U.S.C. § 941, requires the stevedore, the longshoremen's employer, to provide a "reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen. The ship is not the common employer of the longshoremen and owes no such statutory duty to them.

*Scindia, supra*, 101 S.Ct. at 1623; *id.* at 1628 (Powell, J., concurring). Second, in eliminating the shipowner's liability for the negligence of the stevedore, Congress implicitly relieved the owner of an automatic duty to inspect or supervise the stevedoring operation. Thus, absent a contractual or statutory duty, or an industry custom, to the contrary, "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 1624. Third, our Court has held that the shipowner's mere knowledge of a dangerous condition will not serve, without more, as a basis for liability.

**6.** Section 905(b) provides, in pertinent part, as follows:

> (b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

**7.** Congress clearly intended, however, that neither contributory negligence nor assumption of risk was to be a defense to a negligence action under § 905(b). S.Rep.No. 92–1125, 92d Cong., 2d Sess. 12 (1972); H.R.Rep.No. 92–1441, 92d Cong., 2d Sess. 8 (1972).

See *Albergo v. Hellenic Lines, Inc.*, 658 F.2d 66 (2d Cir. 1981); *Giglio v. Farrell Lines Inc.*, 613 F.2d 429 (2d Cir. 1980).

Notwithstanding the facts that the primary responsibility for longshoreman safety is that of the stevedore, that the shipowner has no general duty to discover an unsafe condition arising during stevedoring operations, and that once it has discovered such a condition it generally has no liability based upon its knowledge alone, the owner's ability to escape liability by reliance on the stevedore is not limitless.[8] Thus, the Supreme Court has held that where the danger to the longshoremen arose from a malfunctioning of ship's gear used in the cargo operations and the malfunctioning was known to the owner, if the stevedore's decision to continue using the gear was "so obviously improvident" that the owner "should have realized that the [gear] presented an unreasonable risk of harm to the longshoremen," the owner would have a duty to intervene and repair the gear. *Scindia, supra,* 101 S.Ct. at 1626. Our Court has formulated a more general principle, applicable not only to the ship's gear but also to transitory conditions on the ship, that if the shipowner knows of the dangerous condition and should anticipate that, even if the condition is obvious, the stevedore will not or cannot correct it and the longshoremen will not or cannot avoid it, the shipowner has a duty to take reasonable steps to eliminate or correct the condition. *Evans v. Transportacion Maritime SS "Campeche", supra* at 855–56.[9]

Applying this principle, we have held that where the shipowner knew of the dangerous condition and affirmatively joined in the decision to have the work continue despite the hazard, the shipowner's reliance on the stevedore to correct the condition could not relieve it from liability as a matter of law. *Id.* at 856–57; *Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364, 367 (2d Cir. 1978). In such circumstances the question whether the owner's actions were negligent or not was for the jury to decide. *Id.* Likewise, we have held that when the shipowner knew of the condition and stood silently by while the stevedore instructed the longshoremen simply to "keep working" and "be careful," the owner could not escape liability as a matter of law by reliance on the stevedore for the correction of the condition. *Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 321 (2d Cir. 1978).

We believe the present case is *a fortiori* to *Evans, Lubrano,* and *Lopez.*[10] Here there is no question that the owner knew of the unsafe condition; the hatch boss brought the mate to the platform and showed him the wire and the grease spots.

---

8. We reject Maritime's argument that because LHWCA § 941(a) and the health and safety regulations promulgated thereunder, 29 C.F.R. § 1918.91(a), impose on the stevedore a duty to keep the work areas "reasonably clear of . . . loose tripping or stumbling hazards," the shipowner cannot be found negligent for failing to remove such hazards. The regulations do not provide that the stevedore's responsibility for the condition of the work spaces is exclusive. The fact that the stevedore has a duty to keep those areas clear does not prevent the shipowner from having one as well; if both the shipowner and the stevedore neglect their duties they may be concurrently negligent. *See, e.g., Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 324–25 (2d Cir. 1978).

9. In *Scindia,* the Supreme Court noted that *Evans* viewed its approach as consistent with § 343A of the Restatement (Second) of Torts (regarding the liability of a landowner for harm to invitees from known or obvious dangers), 101 S.Ct. at 1625 n.21, a section the *Scindia* Court felt did "not furnish sure guidance in cases such as this." *Id.* at 1622 n.14. As to the general principle stated in *Evans,* the *Scindia* Court stated, "We are presently unprepared to agree that the shipowner has precisely the duty described by the Court of Appeals for the Second Circuit . . . ." 101 S.Ct. at 1626. We do not view the Supreme Court as having foreclosed the possibility that at some future time it would be so prepared, nor as having rejected any particular portion of our formulation. And certainly we do not view it as having rejected that part of *Evans, see infra,* held that where a shipowner joins in the decision to have the men keep working despite the danger, it may be liable when injury results.

10. We do not view this case as directly controlled by *Scindia.* Although the topping lift on which Lieggi tripped is part of the ship's gear, the danger that directly caused the fall was merely the presence of the greased wire, not a defect in the wire.

Nor is there any question of liability predicated solely on the owner's knowledge, for here the mate affirmatively undertook to have the unsafe condition corrected. And by making this affirmative undertaking, the owner eliminated any possible reasonable basis for relying on the stevedore to correct the hazardous condition. Indeed, predictably, the shipowner's undertaking to correct the condition lulled the stevedore into inaction: the hatch boss testified that although he might normally have taken steps to correct the condition, he did not do so "because the mate said he was going to come and have that wiring removed." In the circumstances of the present case, the question of shipowner negligence could not properly have been taken from the jury.

The judgment is affirmed.