**Salvatore LUBRANO, Plaintiff,**

v.

**COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO,
Defendant.**

**No. 78 Civ. 3051–CSH.**

United States District Court,
S.D. New York.

Dec. 28, 1983.

---

Zimmerman & Zimmerman, New York City, for plaintiff; Howard Fishkin, New York City, of counsel.

---

**11.** *See, e.g., United States v. Wilson,* 565 F.Supp. 1416, 1437–38 (S.D.N.Y.1983).

**1542**

Healey & McCaffrey, New York City, for defendant; Thomas H. Healey, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Salvatore Lubrano brought this action to recover for injuries suffered on December 16, 1972 while he was working as a longshoreman on the M/V ITAPUCA, owned by defendant Companhia de Navegacao Lloyd Brasileiro ("Brasileiro"). The suit was commenced in state court and removed here by defendant on the ground of diversity. Plaintiff's jury demand was stricken for the reasons stated in the Court's opinion of December 13, 1983, familiarity with which is assumed. Following bench trial, the Court enters the following Memorandum Opinion as its findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

### I.

On the day of plaintiff's injury the ITAPUCA was discharging a cargo of bagged coffee beans at Pier 10, Brooklyn. This was Brasileiro's regular pier in New York harbor. Its vessel frequently carried cargoes of bagged coffee beans. Brasileiro had entered into a stevedoring contract with Pittston Stevedoring Corporation ("Pittston") to load and discharge Brasileiro vessels in the port. That contract is in evidence at DX B. Plaintiff Lubrano was an employee of Pittston.

Plaintiff boarded the ITAPUCA for work at 8:00 a.m. on December 16, 1972. Plaintiff was a member of a gang of longshoremen headed by a hatch boss named Circolone. Plaintiff was a holdman. A holdman, as the name implies, works in the holds (or hatches) of the assisted vessel, handling cargo. A longshoreman gang also includes deckmen. Deckmen run the winches, and give hand signals from the vessel's gangway to the winch operators and to other longshoremen working cargo on the pier.

The coffee beans were stowed in loosely woven bags of burlap-like material. Each holdman is equipped with a cargo hook. To discharge a bag of coffee beans, two holdmen approach the bag, one at each end. Each holdman inserts his hook into the bag. They then lift the bag on to a wooden pallet. When a full draft of bags has been assembled on the pallet, a longshoreman driving a hi-lo machine picks the pallet up and places it in the square of the hatch. Wires from the winch on deck are then attached, and the pallet is lifted up out of the hold, and swung over the side of the vessel to the pier.

The construction of the bags and the manner in which they are handled inevitably give rise to some spilling of coffee beans in the holds of the vessel and on deck. Coffee beans are valuable. Efforts are accordingly expended to retrieve spilled coffee beans. Brasileiro and Pittston dealt with the subject in the stevedoring contract. Article III(j) generally obligates Pittston to supply coopering services. Article III(j)(2)(b) specifically provides that Pittston is to be responsible for:

"... sewing bags in holds, on deck, platforms, and wharf; also sweeping up and bagging in holds, on deck, platforms and wharf. Discharge of all spills and sweeps on the ship to be made at intervals during the operations and at the termination of the working hatches."

Plaintiff and his gang were working the No. 3 hold on the ITAPUCA. Cargo had been discharged at least during the previous day. When the longshoremen began work on December 16, the tween deck was free of cargo. The remaining bags of coffee beans were in the wings and aft end of the lower hold. The gang resumed discharging the cargo in the manner described above.

Work continued past the usual quitting time of 5:00 p.m. As the daylight appearing through the open hatch faded, illumination was supplied by two or three artificial lights fixed in the ceiling of the lower hold. The remaining cargo in the No. 3 lower hold was completely discharged without incident. At about 5:45 p.m., the gang undertook to lift the hi-lo out of the hold by

means of the ship's winches. The hi-lo was to be lifted by four wires attached to the corners of the machine. The hi-lo was positioned in the center of the hatch square to facilitate its elevation. Lubrano affixed one of the lifting wires to a corner of the machine. He walked across the steel deck, without incident, in order to approach the machine and secure the wire. According to his testimony, he then backed away from the hi-lo, keeping his eyes upon it. This he described as good safety procedure when a heavy object is about to be swung up into the air. He took two steps backwards. He then felt his left foot begin to slip out from under him. To save himself from falling, plaintiff reached out and grabbed the hi-lo or the lifting wire he had just affixed; the evidence is not clear on the point. But plaintiff's submission as to the mechanics of the accident is that, as lifting strain was applied to the wire, his left thumb became caught between the wire and the machine and was injured.

Plaintiff further alleges that he was caused to slip by stepping upon loose coffee beans.

The injury to plaintiff's thumb caused him to miss fifteen weeks' work. He lost wages in the amount of $3,000. He also claims past and future pain and suffering.

Plaintiff adduced evidence in support of three alleged faults on the part of the vessel. First, it is said that the loose coffee beans on the steel deck of the lower hold created a dangerous condition in which the longshoremen were required to work. Second, it is said that the ship's winch servicing the No. 3 hold was defective in that it did not generate lifting power in its lowest gear setting. The winch did not function until it was placed in the second setting, at which point it operated at a more accelerated rate than would have been the case in lowest gear. Third, it is said that the artificial lights rigged in the ceiling of the lower hold were inadequate.

Plaintiff called as a witness Joseph Tanzi, a fellow longshoreman and member of the gang working the No. 3 hatch on the day in question. Tanzi was a deckman. As such, he alternated between giving hand signals from the gangway and operating the winch. Tanzi testified that during discharge, he heard complaints from the holdmen about the presence of loose coffee beans. The holdmen asked that the coffee beans be cleaned up. Tanzi first communicated this fact to the hatch boss, Circolone. Circolone responded that he would have to go to the dock and see if the stevedore foreman had someone to send into the hold to attend to the coffee beans. Thereafter—the time would appear to be about mid-afternoon—Tanzi spoke to an individual who he identified as a ship's mate. Tanzi made that identification by the individual's "beige" uniform. Tanzi quoted himself as saying to the mate that there were loose coffee beans that should be swept up. Tanzi also complained about the crane, stating that the "first point [gear] won't take." The mate, according to Tanzi's evidence, responded that he would take care of these things.

According to plaintiff's evidence, nothing was done about either complained-of condition until the accident occurred.

With respect to the allegedly insufficient lighting, there is no evidence that any specific notice was given concerning this condition to any member of the ship's company at any time.

## II.

The controlling statute is the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 et seq. When a longshoreman is injured working on board a vessel, § 905(b) gives him a direct cause of action against the vessel owner for injuries caused by the owner's negligence. Implementation of that deceptively simple principle has repeatedly engaged the attention of the United States Supreme Court and the lower federal appellate courts, most notably the Second Circuit. A recurrent theme is the interaction of legal duties owed to longshoremen by their stevedore employers and by vessel owners. Under the statute the longshoreman cannot sue the stevedore, his employer. He can sue the vessel owner. The

stevedore has contracted to render professional services to the vessel owner. Government has undertaken to regulate the responsibilities of both stevedore and vessel owner. Much litigation has emerged from this web of relationships.

 To recover against Brasileiro, plaintiff Lubrano must prove that a dangerous condition for which Brasileiro was responsible caused his injury. Liability of the shipowner attaches in the event of such proof, notwithstanding that the stevedore-employer may also have been negligent. It is now clear that "if the stevedore and shipowner are both guilty of nonperformance of their duties, they may be concurrently negligent." *Tragni v. Establissement Maritime Camille*, 705 F.2d 92, 93 (2d Cir.1983). Concurrent negligence of stevedore and shipowner renders the latter liable for the longshoreman's entire loss, subject only to reduction for his contributory negligence. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).

In the case at bar, plaintiff urges the existence of three dangerous conditions: a defective winch; inadequate lighting in the lower hold; and a slippery condition created by loose coffee beans. The first two alleged conditions may be quickly disposed of.

 As to the winch, I accept plaintiff's evidence that it did not properly engage in low gear and that Tanzi complained about it to a mate. But there is no proof that the condition caused or contributed to Lubrano's injury. In summation plaintiff's counsel disclaimed any contention that the operation of the winch caused plaintiff to slip. There is no argument, for example, that a "jerky" motion of the winch caused an unusual number of coffee beans to be strewn about the lower hold. Nor is there proof from which such a finding could be made. Plaintiff's theory must be that the running of the winch in a higher gear placed additional pressure on the lifting wire and his thumb when he grabbed the hi-lo to keep from falling. But this is entirely speculative and unsupported by proof.

There is no credible evidence to support a finding that the vessel's artificial lights were inadequate. This is, of course, a potential source of liability for a shipowner. In *Tragni, supra*, the district court after discovery granted summary judgment to the shipowner on the view that only the stevedore could be regarded as negligent in law. The Second Circuit reversed. The plaintiff longshoreman had fallen while approaching a ladder by walking over cargo in the far reaches of a lower hold that had no permanent lighting fixtures. It was dark. The crew had placed two portable lights on the coaming at the top deck. The longshoremen had complained, before the accident, that this lighting was inadequate. Holding that summary judgment was inappropriate, the Court said at 705 F.2d 94:

> "Appellant has alleged facts which might establish the shipowner's negligence. The ladder was supplied and maintained by the vessel's crew, and permitting the cargo to be stored so that the longshoremen would have to traverse it without proper illumination to reach the ladder may have amounted to countenancing a hazard known to, and avoidable by, the shipowner. No permanent lighting fixtures were in place in any part of the hold. The ship appears to have been carrying only two portable lights, and crewmen were aware the longshoremen had complained these were insufficient."

In the case at bar, permanent ceiling lights were installed in the lower hold. There is no convincing evidence of complaints from the holdmen about inadequate lighting. Longshoremen do not ordinarily suffer hazardous conditions without complaint. Accepting *arguendo* Tanzi's evidence, they did in fact complain about loose coffee beans. If I were able to find that the lighting was in fact inadequate for post-sundown work in the lower hold, liability for a shipowner-created dangerous condition might attach even if the longshoremen made no complaints. Cf. *Doca v. Marina Mercante Nicaraguense*, 634 F.2d 30 (2d Cir.1980). But the absence of complaint furnishes a basis for inferring that the ship's lighting was sufficient. At one

point in his testimony Lubrano expressed the view that, after the daylight faded, the lighting was "not enough." But he did not seem to press the point with any vigor. No other holdman was produced to complain of the lighting. The lighting was apparently sufficient to permit the longshoremen to rig the lifting wires to the hi-lo. Plaintiff testified that he could see some loose coffee beans on the deck. The argument must therefore be that stronger lighting might have revealed more beans. That is not a sufficiently strong argument to cast Brasileiro in fault for lighting which I find, on the totality of the evidence, to have been adequate for the contemplated work.

That brings me to the coffee beans. Although counsel for Brasileiro argues that plaintiff has not proved it, I find that he did in fact slip on loose coffee beans in the hold. But that is not enough to hold Brasileiro liable. Cause in fact becomes proximate cause only if the beans constituted a dangerous condition which defendant's negligence created or permitted to continue.

■ Plaintiff's proof is deficient on both counts. The fact that his footing was affected by contact with coffee beans does not transform the beans' presence on deck into a dangerous condition. Judge Wyatt reached that conclusion in the closely analogous case of *Fernandez v. Pehusahaan Pelayaran Samundera*, 82 Civ. 1270 (S.D. N.Y., June 14, 1983). He wrote:

> "The spilling of some coffee beans on the deck during the discharge of coffee bags is a normal, usual and regular occurrence. It comes about principally because the bags for a good reason are loosely woven and because hooks, used by the men in handling the bags, tear holes in the bags.... There was nothing unusual about the discharge of coffee beans from the PANJANG before plaintiff fell. It was done in the usual and customary manner and for a maximum time period of two hours and fifteen minutes before the plaintiff fell. The presence of coffee beans on the deck area on the inshore side of No. 2 hatch, where plaintiff fell, did not make that area into a danger or hazard." Slip op. at 8–9.

■ I agree with Judge Wyatt that "a normal, usual and regular occurrence" during the course of an unremarkable discharge does not implicate concepts of danger and negligence under § 905(b) of LHWCA. These coffee beans did not make the lower hold deck into a dangerous place to work.

But my decision exonerating the defendant shipowner in this case does not rest on that proposition alone. Assume *arguendo* that the coffee beans on the ITAPUCA did in fact constitute a hazard: because, say, discharging had gone on longer and more beans accumulated than in *Fernandez, supra*. I am then presented with a dangerous condition created not by the shipowner, but by the stevedoring operation. The shipowner's responsibility in such assumed circumstances must be considered.

■ I accept Tanzi's testimony that after he relayed the longshoremen's complaint about loose coffee beans to hatch boss Circolone, he also told a ship's mate about it. But that notice is not sufficient to visit liability upon the shipowner. It is now clear in this circuit that where the vessel owner has hired an independent stevedoring contractor, and a dangerous condition arises during stevedoring operations, the shipowner "generally has no liability based upon its knowledge alone," *Lieggi v. Maritime Company of the Philipines*, 667 F.2d 324, 328 (2d Cir.1981); *Evans v. Transportacion Maritime Mexicana*, 639 F.2d 848, 856 (2d Cir.1981). Under the statutory and regulatory scheme, "the primary responsibility for longshoreman safety is that of the stevedore." *Lieggi, supra*, at 328. "The stevedore is specifically hired for its expertise in coping with the dangers inherent in loading and unloading cargo, and in many cases it will be perfectly reasonable for the shipowner to assume that the stevedore will correct the defect." *Evans, supra*, at 856. In *Scindia Steam & Navigation Co. v. De Los Santos*, 451 U.S. 156, 176, 101 S.Ct. 1614, 1626, 68 L.Ed.2d 1 (1981), the Supreme Court emphasized that

"the legal duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed are relevant in determining whether the shipowner has breached its duty." Legal duties may fall upon the stevedore as the result of regulations, general principles of law, or specific provisions in the contract between the stevedore and shipowner.

But it is equally clear that "the owner's ability to escape liability by reliance on the stevedore is not limitless." *Lieggi, supra,* at 328. The *Lieggi* court observed that "if the shipowner knows of the dangerous condition and should anticipate that, even if the condition is obvious, the stevedore will not or cannot correct it and the longshoremen will not or cannot avoid it, the shipowner has a duty to take reasonable steps to eliminate or correct the condition," citing the discussion in *Evans* at 855–56 for authority. The *Lieggi* court continued:

"Applying this principle, we have held that where the shipowner knew of the dangerous condition and affirmatively joined in the decision to have the work continue despite the hazard, the shipowner's reliance on the stevedore to correct the condition could not relieve it from liability as a matter of law. *Id.* at 856–57; *Lubrano v. Royal Netherlands Steamship Co.,* 572 F.2d 364, 367 (2d Cir.1978)..... Likewise, we have held that when the shipowner knew of the condition and stood silently by while the stevedore instructed the longshoremen simply to 'keep working' and 'be careful,' the owner could not escape liability as a matter of law by reliance on the stevedore for the correction of the condition. *Lopez v. A/S D/S Svendborg,* 581 F.2d 319, 321 (2d Cir.1978)." *Ibid.*

More recently, in *Moore v. M.P. Howlett, Inc.,* 704 F.2d 39, 42 (2d Cir.1983), the Second Circuit stated:

"The shipowner is not relieved of liability as a matter of law simply because it relied on the stevedore to correct the condition, *Lieggi,* 667 F.2d at 328; *Evans,* 639 F.2d at 856–57, or because it relied on the stevedore's judgment to proceed with the work in spite of the condition, *Lieggi,* 667 F.2d at 328; *Lopez*

*v. A/S D/S Svendborg,* 581 F.2d 319, 324 (2d Cir.1978)." At 42.

*Moore* cites *Giglio v. Farrell Lines, Inc.,* 613 F.2d 429, 433 (2d Cir.1980) for the proposition:

" 'The *sine qua non* of a ship's liability for an obviously dangerous condition arising during the process of loading or unloading is reasonable anticipation that the longshoremen will not be able to avoid it.' " *Ibid.*

In *Moore,* where a vessel owner had actual knowledge of a dangerous condition on deck and the opportunity to alleviate it, the appeal focused "on whether under the evidence the shipowner had a duty to anticipate the harm to plaintiff," a longshoreman who fell on deck. *Moore* quotes *Lieggi* at 328 when it lays down this general rule:

"Following the principle of § 343A of the Restatement (Second) of Torts, which exempts a possessor of land from liability to an invitee for harm caused by known or obvious hazards 'unless the possessor should anticipate the harm despite such knowledge or obviousness', we have concluded that 'if the shipowner knows of the dangerous condition and should anticipate that, even if the condition is obvious, the stevedore will not or cannot correct it *and* the longshoremen will not or cannot avoid it, the shipowner has a duty to take reasonable steps to eliminate or correct the condition.' " At 42 (emphasis added).

The use of the conjunctive "and," instead of the disjunctive "or," indicates that the vessel owner, to be liable, must reasonably anticipate the failure of both stevedoring company and longshoremen to deal with or avoid the hazard.

Consistent with these principles, the Second Circuit has held in *Albergo v. Hellenic Lines, Ltd.,* 658 F.2d 66 (2d Cir.1981), that where the hazard consists of obvious and easily removable objects, the shipowner is not under a duty to anticipate that the stevedore and longshoremen cannot or will not deal with the problem. In *Albergo* the injured longshoreman claimed he tripped over loose rope cuttings on deck. The

Second Circuit affirmed the district court's granting of judgment n.o.v. to the shipowner, stating in part:

> "The duty to clear away any loose debris when that can be done as plaintiff did it here, is placed squarely on the stevedore employer, not the vessel owner. Thus, the danger to be perceived, if any, spells the duty of the stevedore to be observed. With the duty on the plaintiff's employer it would be contradictory to suggest that loose debris of the sort here involved, so easily removable as it was here, by hand, can establish liability for negligence on the part of the vessel owner. The longshoreman is adequately protected by looking to his employer for compensation when injured by accident." 658 F.2d at 69.

As for the actions of the injured longshoreman himself, the *Albergo* court wrote:

> "The simple act performed by the plaintiff of moving the skinny rope cuttings aside with his hand from the area where he had to shackle, which was the area of the accident, eloquently strikes down any notion of the existence of a negligent condition for which the vessel owner could be held in damages. As a matter of law there was no such negligent condition nor any basis for anticipation that the longshoreman could not avoid the rope in this case—certainly not one remaining at any time after plaintiff cleared the untidy condition impeding him."

*Albergo* traces the sources of the stevedore's primary responsibility for the safety of longshoremen. That responsibility begins with the LHWCA, which requires the stevedore to "furnish and maintain employment and places of employment which shall be reasonably safe for his employees" and to comply with the regulations promulgated under the Act. 33 U.S.C. § 941(a). The regulations promulgated by the Occupational Safety and Health Administration ("OSHA") appear in 29 C.F.R. Part 1918. 29 C.F.R. § 1918.2(a) places responsibility for compliance with the regulations upon "employers" as defined in § 1918.3(c).[1] Section 1918.3(c) defines "employer" as "an employer any of whose employees are employed, in whole or in part, in longshoring operations or related employments..." Under the general caption "Housekeeping," the regulations provide that working areas "shall be kept reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards." The regulations also provide that "[s]lippery conditions shall be eliminated as they occur." § 1918.91. Of course, under the cases cited *supra*, the primary responsibility for safety which falls upon the stevedore does not entirely derogate the shipowner's duty. In *Lieggi, supra,* Judge Kearse said in a footnote:

> "The regulations do not provide that the stevedore's responsibility for the condition of the work spaces is exclusive. The fact that the stevedore has a duty to keep those areas clear does not prevent the shipowner from having one as well; if both the shipowner and the stevedore neglect their duties they may be concurrently negligent." 667 F.2d at 328 n. 8.

But while for that reason, as the *Lieggi* court observed in text, the shipowner's "ability to escape liability by reliance on the stevedore is not limitless," its liability is nonetheless limited by those particular concepts of reliance and foreseeability which emerge from the cited cases.

Applying these principles to the case at bar, plaintiff cannot recover from the defendant shipowner. Discharging the cargo in the No. 3 lower hold had been completed. All that remained was to lift the hi-lo machine out of the hold. The hi-lo stood in the square of the hatch, awaiting its levitation. The longshoremen had to approach the hi-lo to attach the wires by walking across the deck. If the presence of loose coffee beans on the deck constituted a hazard, the hazard could easily be eliminated by pushing or sweeping the beans away. In this regard, the coffee beans in the case at bar are indistinguishable from the loose

1. The citations to regulations in text are derived from the July 1, 1983 revision. The regulations cited in *Albergo* bore somewhat different numbering, but their substance was the same.

rope cuttings in *Albergo, supra.* But the instant case is even stronger for the shipowner than *Albergo. Albergo* turned upon the responsibility placed upon the stevedore by the statute and regulations. That responsibility applies equally in the case at bar. But this case contains an additional source of stevedore responsibility. The stevedoring contract, quoted *supra,* placed upon Pittston, plaintiff's employer, the responsibility for "sweeping up and bagging" loose coffee beans in the holds, such work to be performed "at intervals during the operation and at the termination of the working hatches." Thus the shipowner and its employees were entitled under the contract to anticipate that the stevedore would perform the kind of work which, had Pittston been faithful to its obligations on the day in question, would in all likelihood have prevented the accident.

Furthermore, there was uncontroverted testimony from defendant's witness Lucio Pimenta, at the pertinent time Brasileiro's shore superintendent in New York, that as a matter of custom and usage the longshoremen's union simply did not permit members of the ship's crew to go into the holds and perform the sweeping function which the stevedoring contract placed upon the stevedore. In these circumstances, it cannot be said that the shipowner, by action or inaction, breached any duty owing to the plaintiff.[2]

In his trial brief plaintiff relies, as other longshoremen in the port have done, upon the Joint Maritime Safety Code prepared by the New York Shipping Association, Inc., International Longshoremen's Association, and the Port of New York Joint Safety Committee, with an effective date of January 1, 1970. This Code, which also places upon the "owner, master and officers of the vessel" the duty to supply and maintain in safe condition "work spaces which are to be used in stevedoring operations," is said to render the owners of vessels calling at the Port of New York jointly liable for such conditions, notwithstanding their retention of an independent stevedore bearing the responsibilities falling upon stevedores under the OSHA regulations. Circuit Judge Oakes has argued for this theory of a vessel owner's liability, in his dissents in *Albergo, supra,* and in *Giglio v. Farrell Lines, Inc.,* 613 F.2d 429 (2d Cir.1980). But his is a dissenting view, and I conceive it to be contrary to the prevailing weight of Second Circuit authority. Moreover, the majority view is in my respectful judgment clearly correct. A vessel owner's joint fault under the Safety Code would render the owner liable for the full amount of the injured longshoreman's injuries,[3] even if the vessel owner had not created the condition, the independent stevedore had negligently failed to correct it, and the vessel owner could not have reasonably anticipated that failure. That result would be inconsistent with the thrust of recent authority holding that the vessel owner may rely upon the expertise of the

---

**2.** In this regard it is pertinent to note that the mate's response to Tanzi fell considerably short of an assurance that the ship's crew would deal with the coffee beans. Plaintiff's counsel conceded at summation that the mate could not have known that hatch boss Circolone had previously been asked to have the beans swept up and failed to do so. Accordingly it is equally plausible to interpret the mate's response as an undertaking to pass the request along to the stevedore. The stevedore's exclusive responsibility for sweeping up coffee beans in the hold, under the contract and port custom, enhances the plausibility of that interpretation.

**3.** In *Edmonds v. Compagnie Generale Transatlantique, supra,* an injured longshoreman was employed by an independent stevedoring company. The jury, responding to a special verdict, determined that he was responsible for 10% of the total negligence which caused his injury; that the stevedore's fault contributed 70%; and that the vessel owner was accountable for 20%. The Supreme Court held the longshoreman entitled to recover 90% of his damages from the vessel owner, entirely discounting the stevedore company's 70% fault. This result, in the Court's view, was mandated by § 905(b) of LHWCA, which "prevents the vessel from recouping from the stevedore any of the damages that the longshoreman may recover from the vessel," while leaving unchanged "the traditional rule that the longshoreman may recover the total amount of his damages from the vessel if the latter's negligence is a contributing cause of his injury, even if the stevedore, whose limited liability is fixed by statute, is partly to blame." 443 U.S. at 263–64, 99 S.Ct. at 2757–58.

stevedoring contractor. In *Evans, supra,* the Second Circuit observed that "in many cases it will be perfectly reasonable for the shipowner to assume that the stevedore will correct the defect." 639 F.2d at 856. Under Judge Oakes's view, a vessel owner could no longer indulge in that bargained-for assumption; and in practical result, the vessel owner would assume sole responsibility to an injured longshoreman in circumstances where the federal regulatory scheme places primary responsibility upon the stevedoring contractor. I do not believe that this construction and effect of the industry Code is consistent with the rule presently prevailing in this circuit. Certainly the argument has no appeal where, as here, the stevedore is under not only a primary responsibility for safety derived from federal statute and regulations, but also an exclusive responsibility for sweeping up coffee beans derived from its contract and the custom of the port.

In these circumstances, there can be no liability on the part of the shipowner. Assuming contrary to my prior finding that these loose coffee beans constituted a hazard, there is no basis to conclude that the shipowner should have anticipated the failure of the stevedore and the plaintiff to remove or avoid the hazard.

## CONCLUSION

Because no basis for a holding defendant liable appears from this record, the Clerk of the Court is directed to dismiss the complaint with prejudice. Defendant may recover its costs in an amount to be taxed by the Clerk.

It is So Ordered.